505 A.2d 826

**Barbara J. FRYE, Ind. and as Next Friend and Guardian of George L. Frye III**

v.

**George L. FRYE, Jr. and Selected Risks Insurance Company.**

No. 98, Sept. Term, 1985.

Court of Appeals of Maryland.

March 11, 1986.

John R. Webster (Miller & Webster, on brief), Clinton, for appellant.

Stephen J. Kleeman (David D. Patton, on brief), Baltimore, for appellee.

Argued before SMITH, Senior Judge, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

CHARLES E. ORTH, Judge.

The doctrine usually called the parent-child immunity rule exists in Maryland. It evolved through judicial decision and has been followed for over half a century. We are now asked whether it should be abrogated by this Court. We do not believe that it should be.

I

George L. Frye, Jr., was driving an automobile owned by his wife, Barbara J. Frye and insured by Selected Risks Insurance Company, when it veered off the road and struck a culvert. Barbara and George L. Frye, III, their infant, unemancipated son, were injured. Barbara, individually and as guardian and next friend of George III,[1] filed suit in the Circuit Court for Prince George's County against George Jr. for damages resulting from the father's negligence in the operation of the automobile (1st count) and against Selected Risks Insurance Company for damages resulting from breach of contract in denying a claim based on the uninsured motorist provision of its insurance policy (2nd count). Upon motion, the court dismissed the action as to Barbara individually because no relief could be granted on her claim due to the operation of the interspousal immunity rule, which although not then in effect, had been applicable when her action accrued. *See Boblitz v. Boblitz,* 296 Md. 242, 275, 462 A.2d 506 (1983). Upon a second motion to dismiss, the court dismissed the action as to George III because no relief on his behalf could be granted due to the operation of the parent-child immunity rule. The court also dismissed the action against the insurance company. Final judgment as to all parties, under both counts, was rendered and Barbara noted an appeal to the Court of Special Appeals. She promptly requested that this Court cause the record and proceedings to be certified to it before decision by the intermediate appellate court. We granted the request. Her petition asked:

(1) Whether the parent-child immunity rule as to cases sounding in negligence should be abrogated in light of *Boblitz v. Boblitz,* 296 Md. 242, 462 A.2d 506;

(2) Whether, if the parent-child immunity rule is upheld ... George L. Frye, Jr. would be rendered an uninsured

---

**1.** Hereinafter, unless otherwise indicated, reference to "Barbara" includes Barbara J. Frye individually and as guardian and next friend of George L. Frye, III.

motorist, giving [George L. Frye, III] rise to a claim under the uninsured motorist provision of the motor vehicle policy.

## II

"[T]here is nothing in the [old] English decisions to suggest that at common law a child could not sue a parent for a personal tort." *Mahnke v. Moore,* 197 Md. 61, 64, 77 A.2d 923 (1951). But near the end of the last century a court in this country held flatly that a child could not maintain such an action. *Hewlett v. George,* 68 Miss. 703, 9 So. 885 (1891) involved a suit in tort for damages brought by a minor child against her mother for "wilfully, illegally and maliciously" having the child confined in an insane asylum in order for the mother to obtain the child's property. The Supreme Court of Mississippi decided that the minor child could not maintain the action. It opined that "[t]he state, through its criminal laws, will give the minor child protection from parental violence and wrongdoing, and this is all the child can be heard to demand." 68 Miss. at 711, 9 So. at 887. It baldly declared that "[t]he peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent." *Id.* The court made no distinction between acts which were negligent due to an error of judgment and wilful, wanton or malicious acts. The opinion did not cite any judicial decision or any other authority for its broad holding, but for forty years it was blindly followed by many courts throughout the country, both with respect to negligent acts and malicious acts. *See,* for example, *McKelvey v. McKelvey,* 111 Tenn. 388, 77 S.W. 664 (1903) (minor daughter severely injured by cruel and inhuman treatment inflicted by her father and stepmother); *Roller v. Roller,* 37 Wash. 242, 79 P. 788 (1905) (father raped his 15-year-old daughter and was convicted of the crime); *Matarese v. Matarese,* 47 R.I. 131,

131 A. 198 (1925) (minor child injured as a result of parent's negligence in the operation of an automobile). Five years later, this Court broadened the *Hewlett* rule that a minor child has no right to assert any claim to civil redress for personal injuries suffered at the hands of the parents while adhering to its basic concept. In *Schneider v. Schneider,* 160 Md. 18, 152 A. 498 (1930), this Court held that a mother cannot sue her minor child for injuries sustained in an automobile accident in which she was a passenger and the child was the driver. So the rule was construed as applying not only to actions by the minor child against the parent, but also to suits by the parent against the minor child. We clung to the *Hewlett* rule in *Yost v. Yost,* 172 Md. 128, 190 A. 753 (1937) in holding that a minor child cannot maintain a suit in equity against a father for failure to provide support or for neglect.

Shortly before our decision in *Schneider,* the Supreme Court of New Hampshire repudiated the absolute rule of *Hewlett* with respect to wilful acts as distinguished from negligent acts. In *Dunlap v. Dunlap,* 84 N.H. 352, 150 A. 905 (1930), the court said:

On its face, the rule is a harsh one. It denies protection to the weak upon the ground that in this relation the administration of justice has been committed to the strong and that authority must be maintained. It should not be tolerated at all except for very strong reasons; and it should never be extended beyond the bounds compelled by those reasons. * * * The father who brutally assaults his son or outrages his daughter ought not to be heard to plead his parenthood and the peace of the home as answers to an action seeking compensation for the wrong. The relation is rightly fortified by certain rules. Outside that relation, the rules are inapplicable; and any attempt to apply them leads to irrational and unjust results. 150 A. at 909–910.

In *Mahnke v. Moore, supra,* we were obviously persuaded by the view in *Dunlap,* cited earlier by this Court in *Schneider,* 160 Md. at 22, 152 A. 498. We also departed

from the absolute rule of *Hewlett* in holding that a minor child had a right of action against the father for cruel and inhuman treatment or for malicious and wanton wrongs.[2]

In *Waltzinger v. Birsner*, 212 Md. 107, 128 A.2d 617 (1957), we refused to extend the *Hewlett* rule to include an emancipated child. We held that a mother could maintain a suit against her adult son for injuries sustained in an accident caused by the alleged negligence of the son in the operation and control of an automobile.

The Court of Special Appeals has applied the parent-child immunity rule in several cases. *See Latz v. Latz a/k/a Shafer*, 10 Md.App. 720, 272 A.2d 435, *cert. denied*, 261 Md. 726 (1971) (mother killed while a passenger in an automobile negligently driven by her unemancipated minor daughter); *Sanford v. Sanford*, 15 Md.App. 390, 290 A.2d 812 (1972) (minor child injured when an automobile was negligently driven by father); *Montz v. Mendaloff*, 40 Md.App. 220, 388 A.2d 568 (1978) (minor child injured when an automobile was negligently driven by mother even though the mother's negligence may have been gross). *But see id.* at 226–229, 388 A.2d 568 (Gilbert, C.J., concurring). In *Shell Oil Co. v. Ryckman*, 43 Md.App. 1, 403 A.2d 379 (1979) the court stated the rule enunciated in *Schneider* as ordinarily denying recovery for damages for negligence between parent and child. 43 Md.App. at 3, 403 A.2d 379. The court refused to carve an exception to the immunity rule for claims arising when the parent and child are engaged in a business activity. *Id.* at 4–5, 403 A.2d 379. It recognized, however, that immunity does not apply when the child reaches maturity and is emancipated or when the parent's

---

**2.** In the presence of their infant daughter, the husband shot his wife "with a shotgun, thereby blowing away the right side of her head, a portion of her skull coming to rest on the kitchen table, and her body collapsing backward over a chair with her head resting in one pool of blood and her feet resting in another." *Mahnke v. Moore*, 197 Md. 61, 63, 77 A.2d 923 (1951). The father kept the child with the dead body for six days, then drove her to his home. The next day "he committed suicide in her presence by shooting himself with a shotgun, thereby causing masses of his blood to lodge upon her face and clothing." *Id.*

conduct is cruel and inhuman or wanton and malicious. *Id.* at 3, 403 A.2d 379.

## III

A common theme appears in the rationale advanced by the courts which championed the parent-child immunity rule. The rule is founded upon the relation in which the parent and the unemancipated minor child stand to each other. The reciprocal dependence and entitlement of that relationship promotes a public policy which the rule reflects. The court in the seminal case of *Hewlett v. George, supra,* declared that the rule furthered

[t]he peace of society, and of families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society.... 68 Miss. at 711, 9 So. at 887.[3]

In *Schneider v. Schneider, supra,* we set out in more detail our reasons for adopting the rule. We said:

The obstacle to the mother's recovery ... is in the fact that she sues a minor son, of whom she, jointly with the father, is the natural guardian.... The ordinary position of parent and guardian of a minor, and that of plaintiff seeking to recover from the minor, are positions which cannot both be occupied by one person at one and the same time. Maintenance of the suit is inconsistent with the parent's status or office, and the dependence of the minor upon her, and also with the dependence of the law upon her for the fulfillment of necessary legal and social functions. A right of action at law is not one open to any and all persons against any others, without reference to relationships which may exist between them. 160 Md. at 21–22, 152 A. 498 (citation omitted).

---

**3.** The court observed: "The state, through its criminal laws, will give the minor child protection from parental violence and wrongdoing, and this is all the child can be heard to demand." *Hewlett v. George,* 68 Miss. 703, 9 So. 885, 887 (1891).

The Court observed that a minor is "dependent upon a parent to provide for him the judgment and care which he, and any property of his, may need during his immaturity." *Id.* at 23, 152 A.2d 498.

> In a suit against him he would ordinarily depend upon his parents to procure him an attorney, for he cannot appoint one.... One of his parents would ordinarily be appointed guardian *ad litem*, he being incapable of defending except by guardian.... And even if, in view of the antagonistic position sought to be taken by the parent, another might be appointed guardian *ad litem*, the natural dependence of the child on the parent would inevitably leave him largely subject to the parent's guidance and direction. There would be question whether the parent would not be obliged to pay the expenses of litigation of the child. And if the child should have property of his own, a parent suing would be in the position of seeking to gain for herself some of that property, while charged with the function of protecting the child's interest in it. *Id.* (citations omitted).

Seeing no need to cite further difficulties, it seemed clear to the Court that

> one person cannot at the same time occupy the position of parent and natural guardian, fulfilling the functions devolved upon that position, and the position of plaintiff demanding damages from the child at law. *Id.*

The Court found no necessity to "dwell upon the importance of maintaining the family relationship free for other reasons from the antagonisms which such suits imply." *Id.* It quoted from Schouler, *Domestic Relations,* § 223, with wholehearted approval: "Both natural and politic law, morality, and the precepts of revealed religion alike demand the preservation of this relation in its full strength and purity." *Id.* at 23–24, 152 A.2d 498.

In *Yost v. Yost, supra,* we discussed the rule in these terms:

The doctrine is founded upon public policy, and is designed to preserve the peace and harmony of the home, under normal conditions, as well as to recognize the authority of the parent, under normal conditions, responsible for the maintenance of the home. 172 Md. at 134, 190 A. 753.

We noted, in explaining why the immunity rule applies to a father's nonfeasance as to the performance of moral duties of support, or for neglect that those duties "grow out of and pertain to the relation of parent and child. Stated differently, for acts of passive negligence *incident to the parental relation,* there is no liability." *Id.* (emphasis added).

As we noted earlier in this opinion, we departed to some extent from the immunity rule of *Hewlett* in *Mahnke v. Moore, supra.* But in doing so we in no way undermined the reasons supporting the rule because the acts of the father there showed complete abandonment of the parental relation. *See, supra* note 2. We observed:

the rule giving [a parent] immunity from suit by the child, on the ground that discipline should be maintained in the home, cannot logically be applied, for when he is guilty of such acts he forfeits his parental authority and privileges, including his immunity from suit. 197 Md. at 68, 77 A.2d 923.

Furthermore, "there can be no basis for the contention that the daughter's suit against her father's estate would be contrary to public policy, for the simple reason that there is no home at all in which discipline and tranquility are to be preserved." *Id.* The Court concluded:

Justice demands that a minor child shall have a right of action against a parent for injuries resulting from cruel and inhuman treatment or for malicious and wanton wrongs. *Id.*

We were careful to point out, however:

It is conceded, of course, that parental authority should be maintained. It is also conceded that a child should

forego any recovery of damages if such recovery would unduly impair discipline and destroy the harmony of the family. Ordinarily, the parent is not liable for damages to the child for a failure to perform a parental duty, or for excessive punishment of the child not maliciously inflicted, or for negligent disrepair of the home provided by the father. These grow out of and pertain to the relation of parent and child. *Id.*

Our refusal in *Waltzinger v. Birsner, supra,* involving negligence in an automobile accident, to expand the rule to include an adult child is entirely consistent with the rationale of the rule. It was contended that it would be against public policy to permit a recovery because of the family relationship. 212 Md. at 125, 128 A.2d 617. We supported our disagreement with this contention by quoting, at 126, from *Weyen v. Weyen,* 165 Miss. 257, 139 So. 608, 610 (1932), in which "both parties [were] adults and each may be sued by the other, there being no question of control or services between them, and each being a free and separate person having the right to sue and be sued." Likewise, in *Waltzinger* the son was not a minor and we found nothing to show that he was "entitled to the control of his mother or [was] entitled to receive any services from her." 212 Md. at 126, 128 A.2d 617. "[B]oth the mother and son [were] free and separate persons having the right to sue and be sued." *Id.* We emphasized that "the chief reason" for the rule was that "such tort actions would disrupt and destroy the peace and harmony of the home which is against the policy of the law." *Id.*

It is clear that for over half a century this Court has recorded its belief in the importance of keeping the family relationship free and unfettered. Our primary concern with regard to matters involving the parent-child relationship was the protection of family integrity and harmony and the protection of parental discretion in the discipline and care of the child. We have steadfastly recognized the authority of parents and their need to fulfill the functions devolved upon them by that position. The parental status should be held

inviolate so that there be no undue interference with the dependence of the minor unemancipated child on the parents for such judgment and care needed during the child's minority or with the dependence of the law on the parent for fulfillment of the necessary legal and social functions associated with the office of parent. This Court has declared it to be the public policy that discipline in the family not be impaired and that tranquility of the home be preserved. Matters which tend to disrupt or destroy the peace and harmony of family or home are not to be condoned. In short, as we declaimed in *Schneider v. Schneider, supra,* the seminal case on the rule in this jurisdiction:

> Both natural and politic law, morality, and the precepts of revealed religion alike demand the preservation of [the parent-child] relation in its full strength and purity. 160 Md. at 23–24, 152 A.2d 498 (quoting Schunler, *Domestic Relations* § 23).

It is equally clear that this Court has had an abiding belief that the parent-child immunity rule enhances the public policy in that it subserves the repose of families and the best interests of society by preserving the peace and harmony of society and of the families composing society. Therefore, the inquiry now turns to the validity of that belief under present day mores and in light of the current status of the law, including our recent abrogation of the companion rule of interspousal immunity as to cases sounding in negligence. In other words, the question whether the parent-child immunity rule in negligence actions like this one should be abrogated by judicial decision calls upon us to determine if it is still justified by demands of public policy.

IV

█ Barbara asks "[w]hether the parent-child immunity rule, as to cases sounding in negligence, should be abrogated in light of *Boblitz....*" She asserts:

> [F]or all the same reasons the Court of Appeals abrogated the Interspousal Immunity Doctrine, this Court should abrogate the Parent-Child Immunity Doctrine. These

doctrines are vestiges of the past and the abrogation of one doctrine dictates the abrogation of the other.

We do not see it that way. The reasons advanced in *Boblitz*, sound as they were with respect to the abrogation of interspousal immunity are, in the main, not pertinent or relevant with respect to the abrogation of parent-child immunity. The major considerations which led to the decision in *Boblitz* give little support for the decision Barbara seeks here.

The *Boblitz* decision was bottomed primarily on the significant changes that have occurred in the relationship of husband and wife. The interspousal immunity rule arose because by marriage a husband and wife were one person at law. "[T]he very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband.... Upon this principle, of a union of person in husband and wife, depend almost all the legal, rights, duties, and disabilities, that either of them acquire by the marriage." *Boblitz*, 296 Md. at 244, 462 A.2d 506 (quoting Blackstone, Book 1, Ch. 15, p. 442). Due to this legal fiction of unity of identity of husband and wife, "[i]f the wife be injured in her person or her property, she can bring no action for redress without her husband's concurrence, and in his name, as well as her own: neither can she be sued without making the husband a defendant." *Boblitz, id.* at 244, 462 A.2d 506 (quoting *Blackstone, supra* at 443). It followed, of course, that a suit would not lie by a wife against her husband. Because a wife had no legal existence apart from her husband, and because her very being was deemed to be incorporated and consolidated into that of her husband, a suit by her against her husband would not only have to include his name but would be tantamount to the husband suing himself. It was upon the concept that the wife performs everything under

the *cover*, that is, protection and influence of her husband, that the interspousal immunity rule came into the law.[4]

"As women's role in society changed," *Boblitz* observed, "the burden of this imputation of inferiority [of married women under the common law] became increasingly intolerable and led to an ever increasing storm of protest." *Id.* at 245, 462 A.2d 506. This led to the passage of various Married Womens Acts. Such statutes were enacted in Maryland late in the nineteenth century, giving married women certain rights, including the right to sue upon contracts and for torts "as fully as if they were unmarried." *Id.* (citation omitted). The Supreme Court of the United States, however, in *Thompson v. Thompson*, 218 U.S. 611, 31 S.Ct. 111, 54 L.Ed. 1180 (1910), over the strong dissent of Justice Harlan, joined by Justices Holmes and Hughes, said that a District of Columbia statute similar to Maryland's Married Womens Act, "was not intended to give [a wife] a right of action as against the husband, but to allow the wife, in her own name, to maintain actions of tort which at common law must be brought in the joint names of herself and her husband." *Boblitz*, 296 Md. at 246, 462 A.2d 506 (quoting *Thompson*, 218 U.S. at 617, 31 S.Ct. at 112). In a series of cases running from the first Maryland case upon the question, *Furstenburg v. Furstenburg*, 152 Md. 247, 136 A. 534 (1927) to the middle of 1978, *see Boblitz*, 296 Md. at 250 n. 4, 462 A.2d 506, this Court relied exclusively upon *Thompson* in holding that the interspousal immunity rule remained viable and barred tort actions by spouse against spouse, despite indications by the Court of misgivings con-

---

4. The majority in *Boblitz v. Boblitz*, 296 Md. 242, 462 A.2d 506 (1983), observed:

Application of the words *inter*spousal immunity to this ancient rule of law [of unity of identity of husband and wife] borders on mockery. It would be more aptly called 'a rule in derogation of married women.' Under it the person and property of a woman upon marriage come under the 'protection and influence' of her husband—for good or ill. She became subservient to his will and fitted with a distasteful yoke of servitude and compelled obeisance that was galling at best and crushing at worst. *Id.* at 245, 462 A.2d 506 (emphasis in original).

cerning the holdings. *Id.* at 250–251, 462 A.2d 506. On 19 July 1978 this Court decided *Lusby v. Lusby*, 283 Md. 334, 390 A.2d 77 (1978). That case, the first in Maryland involving an intentional tort by one spouse against the other, concluded that the interspousal immunity doctrine did not apply to an action for an outrageous, intentional tort and held that a wife could sue her husband in tort for injuries arising from such conduct. The decision left standing the interspousal immunity rule as to a suit sounding in negligence by one spouse against the other.

Prodded by the comments of some of our predecessors who, speaking for the Court, indicated doubt as to the continued propriety of the interspousal immunity rule,[5] and encouraged by the breach in the ramparts of the rule by the holding in *Lusby*, we acceded to the request in *Boblitz* to re-examine the rule which had served as the basis of our decisions up to that time, and determined to consider the case on the merits of the issue of the viability of the rule rather than dispose of the appeal simply on the basis of *stare decisis* or by again calling the matter to the attention of the legislature, which, in the past, had evidenced no interest.

The Maryland cases upholding the interspousal immunity rule had collectively contained citations to decisions in nine states in support of Maryland's position. We found that at the time *Boblitz* was decided 8 of the 9 states had fully or partially abrogated the interspousal immunity doctrine. 296 Md. 250 n. 4, 251 n. 5, 462 A.2d 506. This prompted us to conduct a current survey. Our research revealed that of the 49 states exclusive of Maryland, 27 had abrogated the doctrine fully and 8 partially, 12 continued to recognize the doctrine, and in 2 states a rule of immunity was imposed by

---

5. *See*, for instance, the comments of then Chief Judge Marbury in *Gregg v. Gregg*, 199 Md. 662, 667–668, 87 A.2d 581 (1952) and those of Judge Hammond, later Chief Judge, in *Fernandez v. Fernandez*, 214 Md. 519, 521, 135 A.2d 886 (1957).

statute.[6] Of the 8 states which had abrogated the rule partially, the abrogation was as to motor torts in 6 states, as to all personal injury actions in 1 state and as to intentional torts only in 1 state. *Id.* at 258–269, 462 A.2d 506. Our survey clearly established that the overwhelming weight of authority was in complete accord with the abrogation of the rule as to cases sounding in negligence.

The principal considerations leading to the decision in *Boblitz* were:

(1) The current invalidity of the concept of unity of identity of husband and wife and of the disabilities imposed upon women by the common law.

(2) The passage of the Married Womens Act in Maryland.

(a) The current widespread dissatisfaction with the narrow interpretation of such acts by the majority in *Thompson v. Thompson,* 218 U.S. 611 [31 S.Ct. 111, 54 L.Ed. 1180], and the current widespread agreement with the dissent in *Thompson* of Justices Harlan, Holmes and Hughes of the narrow interpretation.

(b) The provision in Maryland's Married Womens Act which flatly declares: 'Married women shall have power ... to sue ... for torts committed against them, as fully as if they were unmarried.' Md. Code (1957, 1982 Repl. Vol.) Art. 45, § 5 (repealed) (now recodified at Md.Code (1984) § 4–204 of the Family Law Article).

(3) The criticism by certain of our predecessors on this Court of the reasons for decision in the early cases on the subject. *See Fernandez v. Fernandez,* 214 Md. 519, 521, 135 A.2d 886 (1957); *Gregg v. Gregg,* 199 Md. 662, 667–668, 87 A.2d 581 (1952).

---

**6.** These numbers have changed somewhat in the intervening years. Ohio and Tennessee have since abrogated interspousal immunity, *see Shearer v. Shearer,* 18 Ohio St.3d 94, 480 N.E.2d 388 (1985); *Davis v. Davis,* 657 S.W.2d 753 (Tenn.1983). Wyoming has abrogated interspousal immunity, at least as to motor torts. *See Allstate Ins. Co. v. Wyoming Ins. Dept.,* 672 P.2d 810 (Wyo.1983).

(4) The big parade of cases which have altered the common law rule since *Stokes v. Taxi Operators Ass'n,* 248 Md. 690, 237 A.2d 762 (1968), our last decision upholding the rule. The overwhelming weight of authority now favors abrogation of the rule.

(5) There is no legislative barrier to abrogation of the rule. 'Indeed, after legislative passage and approval by the people of Article 46 of the [Maryland] Declaration of Rights any ancient deprivation of rights based upon sex would contravene the basic law of this State.' *Boblitz,* 296 Md. at 274–275, 462 A.2d 506.

These reasons led the Court in *Boblitz* to

share the view now held by the vast majority of American States that the interspousal immunity rule is unsound in the circumstances of modern life in ... cases [sounding in negligence]. It is a vestige of the past. We are persuaded that the reasons asserted for its retention do not survive careful scrutiny. They furnish no reasonable basis for denial of recovery for tortious personal injury. We find no subsisting public policy that justifies retention of a judicially created immunity that would bar recovery for injured victims in such cases as the present. *Boblitz, id.* at 273, 462 A.2d 506.

The relationship between husband and wife and the relationship between parent and child, although each relates to the family, are separate and distinct. Each has its own peculiar rights and obligations, benefits and responsibilities. The significant changes in the relationship of husband and wife, noted in *Boblitz,* deemed sufficient to render the interspousal immunity rule obsolete, have simply not occurred as to the parent-child relationship.

The light of *Boblitz* shines but dimly on the parent-child immunity rule. It does not follow from the mere fact of our departure from the interspousal immunity rule that we should similarly depart from the parent-child immunity rule. Facially, the reasons for our departure from interspousal immunity, provide little support for a similar departure

from parent-child immunity. "[T]he common law conception of unity of legal identity of husband and wife had no similar conception of unity of legal identity in the case of parent and minor child." *Waltzinger*, 212 Md. at 126, 128 A.2d 617. It being apparent that *Boblitz* is not controlling in the instant case, we look to the nature of the parent-child relationship then and now to determine if it has so changed as to compel its abrogation as a matter of public policy.

## V

At common law the father was charged with the training and education of his minor child. This gave him the right to exercise such control and restraint and to adopt such disciplinary measures for the child, as would enable him to discharge his parental duty. This included the right to chastise refractory and disobedient children within reasonable bounds. *See Lucas v. Maryland Drydock Co.*, 182 Md. 54, 58–60, 31 A.2d 637 (1943). The minor child has the duty, of course, to obey the father. In Blackstone's time, even though the harshness of the ancient Roman laws, which gave the father a power of life and death over his children had been tempered, the power of a parent was "still sufficient to keep the child in order and obedience. He may lawfully correct his child, being under age, in a reasonable manner; for this is for the benefit of his education." *Mahnke*, 197 Md. at 64, 77 A.2d 923 (quoting 1 Sharswood's Blackstone's Commentaries, Book 1 (page 451) * 452). At common law, the father also had the right to the earnings and services of his minor child. *See Greenwood v. Greenwood*, 28 Md. 369, 381 (1868). This was generally so even if the minor did not live with the father. *Id.*, *see also Lucas*, 182 Md. at 57, 31 A.2d 637 (citations omitted). The right of the father to the child's earnings and services arose from the duty of the father to support the child, *Rand v. Rand*, 280 Md. 508, 510–511, 374 A.2d 900 (1977), and to maintain the home, *Yost*, 172 Md. at 134, 190 A. 753. *Cf. Sininger v. Sininger*, 300 Md. 604, 479 A.2d 1354 (1984) (duty of a parent to support an adult *incapacitated* child).

Thus, it was that the common law recognized that "parents possessed rights which were superior to the personal rights of their children, in order to enable the parents to perform their duties more effectually and to recompense them for their care and trouble in the discharge of those duties." *Mahnke,* 197 Md. at 64, 77 A.2d 923.

The benefits and obligations which were impressed on the parent-child relationship at the common law were recognized by legislative enactments from time to time. Unlike legislative action concerning married women, which as finally construed practically eliminated the common law distinctions regarding the rights and duties of a husband and a wife, legislation relating to parent and child served to perpetuate the respective common law rights and duties of a parent and a minor child. In fact, legislation concerning parent and child served to intensify, rather than eliminate, the distinctive rights and duties between them, particularly by bringing the mother more into the picture. Thus, the action of the legislature tended to strengthen the rationale of parent-child immunity rather than weaken it to the point of extinction, as was the case with interspousal immunity. Even a casual glance at the various statutes dealing with parent and child justifies this notion.

We turn to the Family Law Article of the Md.Code (1984). The parent-child relationship continues as to each child of a marriage even when a court of this State annuls a marriage or decrees an absolute divorce for a reason that renders the marriage void *ab inito*. This is so because each child is deemed to be a legitimate child of the parties to the marriage. § 5–202. The parents are the joint natural guardians of their minor child, and a parent is the sole natural guardian if the other parent dies, abandons the family, or is incapable of acting as a parent. § 5–203(a)(1) and (2). Neither the father nor the mother is presumed to have any right to custody that is superior to the right of the other parent, § 5–203(c)(2), and each parent has the same powers and duties in relation to the child, § 5–203(b)(2). Parental rights include the common law right of the father to the

services and earnings of a minor child, now extended to the mother. Section 5–205 provides:

One parent, to the exclusion of the other parent, is entitled to the services and earnings of a minor child if:

(1) that parent has been awarded custody of the child; or

(2) the other parent has abandoned the child or is dead.

The legislature has recognized that the right to services and earnings of a minor child gave rise to the duty of the parent to support and care for the child. *Rand v. Rand,* 280 Md. at 510–511, 374 A.2d 900 (citing *Greenwood v. Greenwood,* 28 Md. 369, 381 (1868)). This duty is imposed upon both the father and the mother. Section 5–203(b)(1) provides:

The parents of a minor child:

(1) are jointly and severally responsible for the child's support, care, nurture, welfare, and education.

The legislature has expressly prohibited the nonsupport and desertion of a minor child and declared such nonsupport and desertion to be a misdemeanor, subject to fine or imprisonment, or both. § 10–203. *See* § 10–219. The domicile of a minor child has been fixed by statute to be ordinarily the domicile of the parents or parent with whom the child lives. § 5–204.

The legislature had made it perfectly clear that it is "the policy of this State to promote family stability [and] to preserve family unity...." § 4–401. The policy is evidenced not only by the statutes mentioned above, which in concept follow the rights and duties of parents and minor children at the common law, but by other statutes codified in the Family Law Article dealing with a wide spectrum of domestic affairs under subtitles such as domestic violence, abused children, neglected children, single parents, battered spouses, paternity proceedings and adoption. The concern of the legislature with family matters is further demonstrated by the enactment of a comprehensive scheme for civil and criminal enforcement of the obligations to support children, parents and spouses, Family Law Article, Title 10,

subtitles 1 and 2, and a Uniform Reciprocal Enforcement of Support Act, subtitle 3.

The fifty-four years which have elapsed since *Schneider* have been marked by shifting values in a changing world. But both this Court and the legislature have been faithful to the promotion of the stability, harmony and peace of the family and to the preservation of parental authority and the family unity as a matter of public policy in the best interests of society. In *Mahnke* we said: "It is conceded, of course, that parental authority should be maintained." 197 Md. at 68, 77 A.2d 923. And we noted further: "It is also conceded that a child should forgo any recovery of damages if such recovery would unduly impair discipline and destroy the harmony of the family." *Id.* We have generally adhered to the view that the parent-child immunity rule was essential to the maintenance of discipline and to the stability of family harmony. It is clear that today's parent-child relationship, as recognized by this Court and the legislature, furnishes no compelling reason to abrogate the rule.

## VI

We have looked beyond the borders of Maryland to ascertain the status of parent-child immunity in other jurisdictions. We have examined the statutes and judicial decisions in each of the other 49 states and in the District of Columbia, and a detailed report of our survey is appended to this opinion.

We find that nine states have retained parent-child immunity in negligence actions. Fourteen states do not now recognize the doctrine. Of those states, nine have abrogated it and five have never adopted it. Twenty-six other states and the District of Columbia have abrogated the doctrine in part.[7]

---

**7.** Restatement (Second) of Torts § 895G(1) (1977) abandons the use of parent-child immunity:

A parent or child is not immune from tort liability to the other solely by reason of that relationship.

**562**

Of the thirty-five states and the District of Columbia which have abrogated parent-child immunity in whole or in part, only two states—New Mexico and South Carolina—have related their action to their abrogation of interspousal immunity. Vermont, in refusing to adopt the parent-child immunity rule, noted its recent decision to abrogate interspousal immunity. Indiana retained parent-child immunity despite an argument that it should be abrogated in light of the abrogation of interspousal immunity. A heavy majority of the states which have abrogated the doctrine in whole or in part have not been reluctant to do so by judicial decision. In several states, however, the abrogation was by legislative enactment.

## VII

Twenty states have specifically excluded motor torts from parent-child immunity, and this is the modern trend. The decisions are marked by two common grounds, although stated in a variety of ways.

1) The operation of an automobile is outside the area of parental control, authority and discretion. With respect to motor torts, the doctrine does not achieve the purpose of promoting family harmony or parental autonomy.

2) Automobile liability insurance, now widely prevalent, negates the family tranquility argument. Insurance tem-

---

Subsection 2, however, cautions:

> Repudiation of general tort immunity does not establish liability for an act or omission that, because of the parent-child relationship, is otherwise privileged or is not tortious.

See Comment k to subsection 2.

The legal scholars and commentators generally take a dim view of parent-child immunity. Fifty years ago, a commentator suggested changes in or abrogation of the doctrine. McCurdy, Torts Between Persons In Domestic Relation, 43 Harv.L.Rev. 1030, 1077–1081 (1930). See also F. Harper & F. James, The Law of Torts § 8.11 (1956); W. Prosser & W.P. Keeton, The Law of Torts § 122 (W.P. Keeton general editor, 5th ed. 1984); McCurdy, Torts Between Parent and Child, 5 Vill.L.Rev. 521 (1960); Hollister, Parent-Child Immunity: A Doctrine in Search of Justification, 50 Fordham L.Rev. 489 (1982); Comment, Parent-Child Tort Immunity: Time for Maryland to Abrogate an Anachronism, 11 U.Balt.L.Rev. 435 (1982).

pers the possibility of family discord and depletion of family resources.

*See, for example, Hebel v. Hebel,* 435 P.2d 8 (Alaska 1967); *Sandoval v. Sandoval,* 128 Ariz. 11, 623 P.2d 800 (1981); *Schneider v. Coe,* 405 A.2d 682 (Del.1979); *Ard v. Ard,* 414 So.2d 1066 (Fla.1982); *Turner v. Turner,* 304 N.W.2d 786 (Iowa 1981); *Nocktonick v. Nocktonick,* 227 Kan. 758, 611 P.2d 135 (1980); *Rigdon v. Rigdon,* 465 S.W.2d 921 (Ky. 1971); *Black v. Solmitz,* 409 A.2d 634 (Me.1979); *Sorensen v. Sorensen,* 369 Mass. 350, 339 N.E.2d 907 (1975); *Sweeney v. Sweeney,* 402 Mich. 234, 262 N.W.2d 625 (1978); *Transamerica Ins. Co. v. Royle,* 202 Mont. 173, 656 P.2d 820 (1983); *Briere v. Briere,* 107 N.H. 432, 224 A.2d 588 (1966); *Unah By and Through Unah v. Martin,* 676 P.2d 1366 (Okla.1984); *Silva v. Silva,* 446 A.2d 1013 (R.I.1982); *Wright v. Wright,* 213 Va. 177, 191 S.E.2d 223 (1972); *Merrick v. Sutterlin,* 93 Wash.2d 411, 610 P.2d 891 (1980); *Lee v. Comer,* 159 W.Va. 585, 224 S.E.2d 721 (1976); *Allstate Ins. Co. v. Wyoming Ins. Dept.,* 672 P.2d 810 (Wyo. 1983).[8] *See also* Conn.Gen.Stat. § 52–572c (1985); N.C.Gen. Stat. § 1–539.21 (1983 Repl.Vol., 1985 Cum.Supp.).

Several other jurisdictions, also abrogating the parent-child immunity in part, have fashioned their exceptions in language suggesting that a parent's negligent operation of a motor vehicle would not be immune. *See Goller v. White,* 20 Wis.2d 402, 122 N.W.2d 193 (1963) (seminal case as to partial abrogation); *see also Foldi v. Jeffries,* 93 N.J. 533, 461 A.2d 1145 (1983). To similar effect, *see Larson v. Buschkamp,* 105 Ill.App.3d 965, 61 Ill.Dec. 732, 435 N.E.2d 221 (1982); *Felderhoff v. Felderhoff,* 473 S.W.2d 928 (Tex. 1971).

The availability of liability insurance is a major consideration of the courts in reaching the decisions in those cases. The courts suggest that insurance is not only a proper element with respect to the public policy supporting the

---

**8.** The cases are listed in alphabetical order by states for ease of reference to the Appendix to this opinion.

abrogation of parent-child immunity, *Sorensen v. Sorensen,* 369 Mass. at 356, 339 N.E.2d at 913–914, but that it makes the "rule of parental immunity anachronistic when applied to automobile accident litigation." *Smith v. Kaufman,* 212 Va. 181, 185, 183 S.E.2d 190, 194 (1971).

We noticed the availability of liability insurance in our seminal case on parent-child immunity:

> Reference has been made in argument to policies or contracts held by one or both of the sons for indemnifying them against loss from recovery of judgment against them.... They would not be relevant. The suit is not one on a policy, and the possession of a policy by the defendants could not affect the disposition of this case. *Schneider v. Schneider,* 160 Md. at 24, 152 A.2d 498.

The Court of Special Appeals rejected the argument that the carrying of liability insurance by the parties should negate the applicability of the immunity rule. It was not unmindful of the direction being taken by other jurisdictions in this area, especially where the parties are insured, but it declined to follow, "leaving it to the Maryland legislature to make this change if it perceives it to be in the best interest of the people of this State." *Montz v. Mendaloff,* 40 Md.App. at 224, 388 A.2d 568. The intermediate appellate court, looking to *Schneider,* had earlier stated in *Lutz v. Lutz a/k/a Schafer,* 10 Md.App. at 729, 272 A.2d 435: "We do not think that the fact that appellee may have been protected by liability insurance affects the answer to the question," namely whether by reason of parent-child immunity a father is precluded from maintaining a tort action, arising from an automobile accident, against his minor child. *Schneider,* of course, was before the advent of compulsory automobile coverage, and we have not considered parent-child immunity in the light of the statutory insurance provisions. The compulsory insurance statutes did not play a significant part in our decision to abrogate interspousal immunity as to cases sounding in negligence. *Boblitz v. Boblitz, supra.*

The General Assembly has commanded that all Maryland automobiles be insured by automobile policies containing the following coverages in certain amounts specified: "[t]he payment of claims for bodily injury or death arising from an accident ...;" for property damage liability; medical, hospital, disability and funeral benefits covering insureds and their families and specified classes of other persons, regardless of fault; and uninsured motorist coverage. Other coverages must be offered to an insured. Md.Code (1984 Repl.Vol.) § 17–103(b) of the Transportation Article; Md. Code (1979 Repl.Vol., 1985 Cum.Supp.) Art. 48A, §§ 539, 540, 541. With regard to the required uninsured motorist coverage the legislature permits the policy to contain a so-called household exclusion clause, Art. 48A, § 541(c)(2), but we have decided that a simlar provision with respect to required liability coverage is invalid because it conflicts with legislative policy. *Jennings v. Government Employees Ins.*, 302 Md. 352, 362, 488 A.2d 166 (1985).

█ We have found that the parent-child relationship, as recognized today by this Court and the legislature, furnishes no compelling reason to abrogate parent-child immunity. The bases on which the rule was adopted over fifty years ago remain as valid now as they were then. Even in the light of changed conditions and increased knowledge, the rule has not become fundamentally unsound in the circumstances of modern life. It is not a vestige of the past, no longer suitable to our people. Generally, it continues to serve the public policy of this State.

We have discovered that a majority of our sister states have retained parent-child immunity to some extent. But we are aware that a significant number of them have abrogated the immunity with respect to motor torts, and that this exclusion is the modern trend, encouraged by the availability of automobile liability insurance. The question is whether, in light of our compulsory liability insurance laws, we should follow this trend by carving out of the

immunity rule injuries suffered by reason of negligence in the operation and use of a motor vehicle.

It may be that the comments of the various courts in excluding motor torts are well founded and worthy of more than passing note. As with most issues, however, there are two sides. It has been said, for example, that this exception to the immunity will establish liability based upon the presence of insurance, that it will cause the cost of liability insurance to increase drastically, that it will lead to collusion and fraud, that, in the presence of insurance, a suit between family members is not truly adversary, that the insurer may not receive the necessary cooperation from a family defendant in providing adequate information for the insured's defense, that a defendant may be too helpful to the plaintiff family member and may prejudice the jury by his statements, and that the presence of insurance will unduly influence a jury to award an unjustifiable large recovery. *See* Comment, *Parent-Child Tort Immunity: Time for Maryland to Abrogate An Anachronism,* 11 U.Balt.L.Rev. 435, 460–461 and 464–465 (1982). There may be persuasive answers to these claims. *See, id.* at 465–466 and cases discussed in the Appendix hereto. But who can best resolve them, the seven judges of this Court or the members of the General Assembly?

The parent-child immunity rule, like the interspousal immunity rule, was a creature of the common law. It was judicially conceived, judicially adopted in Maryland, judicially changed in certain significant aspects, and otherwise judicially nurtured and applied in this jurisdiction, without any reaction from the legislature. Since we are responsible for it, we would be no more reluctant to abrogate the rule entirely as to all cases sounding in negligence, than we were to abrogate entirely the interspousal immunity rule in *Boblitz.* Nor would we hesitate to change the parent-child immunity rule in certain aspects not affecting legislative enactments, as we did in *Mahnke.* In *Boblitz* and *Mahnke* it was appropriate to take judicial action since it was no

longer in the public interest to let the rule stand intact. Compulsory motor vehicle liability insurance, however, is exclusively a creature of the legislature. It reflects a public policy recognized by the General Assembly and is an integral part of an elaborate scheme constructed by the legislature for the general welfare and protection of the People of this State. The exclusion of motor torts from the parent-child immunity rule would inevitably have some impact on the insurance scheme and the social policy it furthers. We do not think it fitting that the nature and consequences of this impact be resolved by this Court. Therefore, whether the exclusion would carfuffle the legislature's insurance scheme, and, if so, to what extent, is properly a matter for the legislature. In short, the exclusion of motor torts from parent-child immunity "involves fundamental and basic public policy considerations properly to be addressed by the legislature." *See Boblitz v. Boblitz, supra* (Couch, J., dissenting), 296 Md. at 288, 462 A.2d 506 (quoting *Harrison v. Mont. Co. Bd. of Educ.*, 295 Md. 442, 463, 456 A.2d 894 (1983)). If we effect the exclusion by judicial action, "we discard our robes for legislative hats without the electoral accountability that legitimizes the legislative product or executive enforcement." *Doe v. Duling, Chief of Richmond Bureau of Police*, 782 F.2d 1202, 1207 (4th Cir.1986).

We decline to abrogate the parent-child immunity rule in its entirety as to actions sounding in negligence or to exclude motor torts therefrom.

## VIII

The automobile which the father was driving and in which the injured minor son was a passenger was the only motor vehicle involved in the accident. It was covered by an insurance policy. The bodily injury and property damage liability coverage of the policy applied to the automobile; it was, therefore, an "insured highway vehicle" as defined in the policy. The policy also provided coverage as to unin-

sured motorists as required by law. *See* Md.Code (1957, 1979 Repl.Vol., 1985 Cum.Supp.) Art. 48A, § 541(c).

■ Barbara contends that because the parent-child immunity rule precluded a suit by the son for the father's negligence, the father "was rendered an uninsured motorist, giving the [son] rise to a claim under the uninsured motorist provision" of the motor vehicle policy. The short answer is that the automobile operated by the father was in fact an insured vehicle. It was not transformed into an uninsured vehicle because the father was immune to an action in negligence by the son. We see nothing in the policy or the statute which supports Barbara's notion. The father was not an uninsured motorist under the insurance contract or in the eyes of the law. We note that under the policy, the insurer promised to "pay all sums which *the insured ... shall be legally entitled to recover* as damages from the owner or operator of an uninsured highway vehicle because of bodily injury or property damage, caused by accident and arising out of the ... use of such uninsured highway vehicle...." (emphasis added). The son, assuming he was an insured, was, nevertheless, not entitled to recover damages from the father, even if the father were an uninsured motorist, because the son was barred from recovery by the parent-child immunity rule. Thus, the uninsured motorist provision of the policy would not be invoked in any event. The parent-child immunity rule closed the front door to redress by the son from the father. The uninsured motorist provision of the policy did not open the back door.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY PETITIONER.

APPENDIX

*Retention of the Immunity*

Alabama, Arkansas, Georgia, Indiana, Louisiana, Mississippi, Missouri, Nebraska and Tennessee still apply the

doctrine of parent-child immunity; however, several of these states have not recently examined the doctrine. One state, Louisiana, retains the immunity in the form of a statute. *See* La.Rev.Stat.Ann. § 9:571 (1965). The statute is specifically limited to the custodial parent and the state has permitted direct actions against insurers. Three other state courts have refused to abrogate the immunity because they feel any change at this point must come from the legislature. *See Hill v. Giordano,* 447 So.2d 164 (Ala.1984) (per curiam); *Pullen v. Novak,* 169 Neb. 211, 99 N.W.2d 16 (1959); *Campbell v. Gruttemeyer,* 222 Tenn. 133, 432 S.W.2d 894 (1968). A review of the statutory indexes of these three states indicates that the legislatures have not so acted. Other states have noted family harmony, the need for parental control and discipline, as well as the potential for fraud and collusion, as reasons for retaining the immunity. *See, e.g., Thomas v. Inmon,* 268 Ark. 221, 594 S.W.2d 853, 854 (1980) (policy considerations of family harmony and the prevention of fraud and collusion remain valid);[1] *Coleman v. Coleman,* 157 Ga.App. 533, 278 S.E.2d 114 (1981) (minor injured in auto accident precluded from suing noncustodial parent-driver because as long as a father-son relationship exists, there is "a continued need for respect and the authority to discipline"); *Vaughan v. Vaughan,* 161 Ind.App. 497, 316 N.E.2d 455 (1974) (parent-child immunity maintained, even after the abrogation of interspousal immunity, in light of the need for parental control during the child's minority and the adverse effect that would arise *vis-a-vis* a child's right to bring civil redress),[2] and *Hewlett*

---

**1.** *Cf. Attwood v. Estate of Attwood,* 276 Ark. 230, 633 S.W.2d 366 (1982) (child injured in an automobile accident caused by his father's voluntary intoxication and excessive speeding allowed to sue because father's actions were viewed as willful and wanton under the circumstances).

**2.** *Cf. Buffalo v. Buffalo,* 441 N.E.2d 711 (Ind.App.1982) (parent-child immunity does not apply to a noncustodial parent as the reasons for maintaining the immunity—protection of domestic peace and tranquility—are not applicable).

*v. George,* 68 Miss. 703, 9 So. 885 (1891) (seminal case cited with approval in *McNeal v. Administrator of Estate of McNeal,* 254 So.2d 521 (Miss.1971)).

Missouri has handled the viability of immunity in a different manner. Essentially, the immunity remains valid but only on a case-by-case basis. *Kendall v. Sears Roebuck & Co.,* 634 S.W.2d 176 (Mo.1982) (en banc); *Fugate v. Fugate,* 582 S.W.2d 663 (Mo.1979). In *Fugate,* the plaintiff-appellant correctly stated the Missouri rule, to wit: "The modern view is that a child may sue a parent in tort if two conditions are present. First, the emancipated child may sue.... Also, the child may maintain a negligence action against the parent if the trial court concludes after an evidentiary hearing that legal proceedings will not disrupt family harmony." 582 S.W.2d at 665 (citations omitted).

### Total Abrogation of the Immunity

California has totally abrogated parent-child immunity, and, in its place, adopted a "reasonable parent" standard. *Gibson v. Gibson,* 3 Cal.3d 914, 479 P.2d 648, 92 Cal.Rptr. 288 (1971). In rendering its decision the court noted that the traditional grounds for maintaining the immunity are no longer valid. Family harmony faces a lesser chance of disruption when an insurer is responsible for the damages. There is some fear of fraud and collusion, but that exists in all cases. The court noted that there is some threat to parental authority and discipline, but did not consider that sufficient to "justify continuation of a blanket rule of immunity." 479 P.2d at 652, 92 Cal.Rptr. at 292. In abrogating the immunity, the court did recognize that traditional concepts of negligence cannot be adhered to in an absolute manner. For example, a spanking does not ordinarily constitute a battery and sending a child to his room does not constitute false imprisonment. The parent's prerogative to exercise authority "must be exercised within reasonable limits." *Id.* 479 P.2d at 653, 92 Cal.Rptr. at 293. The standard employed is "what would an ordinarily reasonable and prudent *parent* have done in similar circumstanc-

es?" *Id.* (emphasis in original). California has totally abrogated interspousal immunity.

Minnesota has adopted California's reasonable parent standard. *Anderson v. Stream,* 295 N.W.2d 595 (Minn. 1980). The State formerly adhered to the *Goller* approach, discussed *infra,* but then decided that the two exceptions were imprecise and, accordingly difficult to apply. Hence, the reasonable parent standard was adopted in its stead. Minnesota has also totally abrogated the rule of interspousal immunity.

In abrogating in full the parent-child immunity, the New Mexico Supreme Court reasoned that "[t]here is no stronger public policy for barring intrafamily suits between parents and children than existed for intraspousal suits." *Guess v. Gulf Ins. Co.,* 96 N.M. 27, 627 P.2d 869, 871 (1981). Moreover, it is the "conduct between the parties that causes the lawsuit to be filed" that causes disharmony, not the lawsuit itself. *Id.*

New York has also abrogated parent-child immunity, as well as interspousal immunity. *Holodook v. Spencer,* 36 N.Y.2d 35, 324 N.E.2d 338, 364 N.Y.S.2d 859 (1974) abrogated the defense of intrafamily immunity but tempered that decision by refusing to recognize a cause of action for negligent supervision. The court reasoned that such suits could lead to strain within the family. 324 N.E.2d at 344, 364 N.Y.S.2d at 865. The court also thought that it would be unwise to apply a standardized norm to parental conduct—as was done in California. 324 N.E.2d at 346, 364 N.Y.S.2d at 867. "The result, we believe, would be to circumscribe the wide range of discretion a parent ought to have in permitting his child to undertake responsibility and gain independence." *Id. Cf. Nolechek v. Gesuale,* 46 N.Y.2d 332, 385 N.E.2d 1268, 413 N.Y.S.2d 340, 344 (1978) (parent does owe a "duty to third parties to shield them from an infant's improvident use of a dangerous instrument, at least, if not especially, when the parent is aware of and capable of controlling its use....").

A North Dakota statute provides that "[e]veryone is responsible not only for the result of his willful acts but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person." N.D.Gen.Stat. § 9–10–06 (1975). *See also Nuelle v. Wells,* 154 N.W.2d 364 (N.D.1967) (no parent-child immunity in light of aforequoted statute).

Finding the four basic justifications for parent-child immunity—family harmony, interference with parental discipline/control, depletion of family resources, and prevention of fraud and collusion—to be "outdated, highly questionale and unpersuasive," the court in *Kirchner v. Crystal,* 15 Ohio St.3d 326, 474 N.E.2d 275, 276 (1984) abrogated the immunity. "If any disruption to family harmony or tranquility occurs, it is more likely to happen as a result of tortious conduct, rather than as a result of allowing redress of the wrongful actions which led to injury." 474 N.E.2d at 277. Indeed, the court reasoned that domestic tranquility would be restored by the abrogation. The court did recognize the widespread prevalence of liability insurance and its practical effect on suits. *Id.* Hence, the immunity was abrogated for public policy reasons. Soon thereafter, Ohio also abrogated interspousal immunity. *Shearer v. Shearer,* 18 Ohio St.3d 94, 480 N.E.2d 388 (1985).

Oregon abrogated parent-child immunity and adopted the position espoused by the Restatement (Second) of Torts. *Winn v. Gilroy,* 296 Or. 718, 681 P.2d 776 (1984). "We agree with the Restatement (Second) of Torts § 895G, *supra,* that the proper inquiry concerns the tortious or privileged nature of a parent's act that causes injury to the child, not a special parental immunity from a child's action for personal torts as distinct from other kinds of claims." 681 P.2d at 784. Such a privilege would not apply to a parent "driving while intoxicated or otherwise contrary to the law." *Id.,* 681 P.2d at 785. Oregon retains, by a "proverbial thread" the doctrine of interspousal immunity. *See Moser v. Hampton,* 67 Or.App. 716, 679 P.2d 1379, *aff'd*

*mem.*, 298 Or. 171, 690 P.2d 505 (1984) (by an equally divided court).

Pennsylvania opted for total abrogation of parent-child immunity in *Falco v. Pados,* 444 Pa. 372, 282 A.2d 351 (1971). Previously, the state upheld the immunity to prevent both family discord and fraud or collusion. Now, the court reasoned that it was the injury itself that disrupted family life, not the suit. 282 A.2d at 355. Furthermore, children have always been allowed to sue as to property or contracts. As to the potential for fraud and collusion, it must be left to juries and trial courts to distinguish between frivolous and substantial claims. *Id.,* 282 A.2d at 356. Pennsylvania has also fully abrogated the interspousal immunity.

Finally, South Carolina totally abrogated parent-child immunity in *Elam v. Elam,* 275 S.C. 132, 268 S.E.2d 109 (1980). The court gave two reasons for this. One, the family harmony argument is no longer valid. This court believed that it was the injury that disrupted family harmony—not the lawsuit. The court also recognized the prevalence of liability insurance. 268 S.E.2d at 111. Two, the court dismissed the possibility of fraud and collusion as a reason to retain the immunity. South Carolina also abrogated, in total, interspousal immunity. In fact, its abrogation was listed as a subsidiary reason for abrogating parent-child immunity.

### Immunity Never Adopted

It appears that five states—Hawaii, Nevada, South Dakota, Utah and Vermont—never adopted the judicially created doctrine of parent-child immunity. In *Petersen v. City & County of Honolulu,* 51 Hawaii 484, 462 P.2d 1007 (1970), it was noted that parent-child negligence suits have always been permitted in Hawaii. "[M]inor children are entitled to the same redress for wrongs done them as are any other persons." 462 P.2d at 1009. Prohibiting recovery will not aid family harmony because any damage to the family relationship occurred at the time of the injury and prohibit-

ing recovery will not restore harmony.  *Id.*  Hawaii has adopted and retained interspousal immunity.

Nevada declined to follow interspousal immunity in *Rupert v. Stienne*, 90 Nev. 397, 528 P.2d 1013 (1974).  In that case, the court indicated that the doctrine of parent-child immunity was never adopted in Nevada, hence, "the right of a child to sue a parent in tort is without restriction or limitation."  528 P.2d at 1018.

South Dakota has apparently never adopted parent-child immunity.  *See* Hollister, *Parent-Child Immunity: A Doctrine In Search of Justification*, 50 Fordham L.Rev. 489, 494 n. 39 (1982).  *Kloppenburg v. Kloppenburg*, 66 S.D. 167, 280 N.W. 206 (1938) addressed the immunity, but applied Minnesota law.  The court did note that the action would not be viable in South Dakota because of the automobile guest statute.  280 N.W. at 206.  (The guest statute was repealed in 1978.)  Interspousal immunity was abrogated over forty years ago.

Utah also never adopted the parent-child immunity.  *See Elkington v. Foust*, 618 P.2d 37, 40 (Utah 1980) ("there is no foundation in our law, statutory or decisional, upon which to base parental immunity"); *see also Bishop v. Nielsen*, 632 P.2d 864 (Utah 1981) (court declined to address issue of parent-child immunity in a contribution case).

Finally, in *Wood v. Wood*, 135 Vt. 119, 370 A.2d 191 (1977), Vermont declined to adopt the parental immunity rule.  "Since this state has historically allowed other kinds of suits between parent and child, ... and has recently set aside interspousal immunity ..., a contrary ruling would be anomalous."  370 A.2d at 193 (citations omitted).  The policies of family harmony, collusion and fraud were deemed insufficient to preclude negligence suits between parent and child.

### Partial Abrogation of the Immunity

Twenty-six states and the District of Columbia have abrogated the parent-child immunity in part.  The vast majority

of those states abrogating the doctrine in part permit a suit premised upon an automobile tort. Indeed, many of the partial abrogations arose precisely in such a factual scenario. For example, Alaska abrogated the doctrine as to motor torts in *Hebel v. Hebel,* 435 P.2d 8 (Alaska 1967). The existence of liability insurance was of "considerable significance" in that insurance negated "adherence to family-harmony and parental-discipline-and-control arguments...." *Id.* at 15. Alaska has fully abrogated the doctrine of interspousal immunity.

Arizona has also abrogated the immunity as to motor torts and has left the door open to further limitation of the immunity.

> We do not, by this case, limit the abrogation of the parental immunity doctrine to automobile negligence cases. We will continue to consider, on a case by case basis, the actual cause of the injury and whether the act of the parent breached a duty owed to the world at large, as opposed to a duty owed to a child within the family sphere. *Sandoval v. Sandoval,* 128 Ariz. 11, 623 P.2d 800, 803 (1981).

In Connecticut the immunity has been abrogated in part by statute. *See* Conn.Gen.Stat. § 52–572c (1985) ("In all actions for negligence in the operation of a motor vehicle, and in all actions accruing on or after October 1, 1979, for negligence in the operation of an aircraft or vessel, ... resulting in personal injury, wrongful death or injury to property, the immunity between parent and child in such negligence action brought by a parent against his child or by or on behalf of a child against his parent is abrogated.") Connecticut has abrogated, in full, the interspousal immunity.

Delaware has similarly abrogated the immunity as to motor torts, but refused to extend its abrogation to a negligent supervision case. *Schneider v. Coe,* 405 A.2d 682 (Del.1979).

Unlike driving an automobile, supervision of one's children involves issues of parental control, authority, and discretion that are uniquely matters of a very personal type of judgment. The freedom to exercise such judgment has constitutional underpinning and contrasts sharply with the state's supervision and regulation of the judgment one must exercise while driving an automobile.

405 A.2d at 684. Essentially, "[p]arental immunity will not be abrogated where the duty arises from the family relationship, for to do so would manifestly tend to disturb domestic tranquility." *Id.* Delaware has retained the interspousal immunity.

In Florida, the courts have abrogated the parent-child immunity in motor torts "to the extent of the parent's available liability insurance coverage." *Ard v. Ard,* 414 So.2d 1066, 1067 (Fla.1982). This exception is limited to the value of the insurance. "If the parent is without liability insurance, or if the policy contains an exclusion clause for household or family members, then parental immunity is not waived and child cannot sue the parent." *Id.* The existence of insurance does not create liability; but instead impacts upon the public policy relied upon to uphold the immunity. More specifically, "[w]hen recovery is allowed from an insurance policy the claimant will not force a depletion of the family assets at the expense of other family members." *Id.* at 1068–1069. Florida still retains the interspousal immunity, but it has been questioned by the lower appellate courts.

Iowa has also abrogated the parent-child immunity, again, at least with respect to motor torts. *Turner v. Turner,* 304 N.W.2d 786 (Iowa 1981). "[W]e hold that, at least outside the area of parental authority and discretion, unemancipated minor children are not barred by the immunity doctrine from suing their parents for negligence torts." 304 N.W.2d at 789. Later, the Supreme Court of Iowa refused to extend its abrogation to suit grounded in negligent supervision. *Wagner By Griffith v. Smith,* 340 N.W.2d 255 (Iowa 1983). In that case, parental immunity was

maintained in two specific instances; that is (1) when the act at issue involves "parental authority over the child; or (2) parental discretion in respect to the provision of food, clothing, shelter, education, medical and dental services, and other care." 340 N.W.2d at 256 (citing *Goller v. White*, 20 Wis.2d 402, 122 N.W.2d 193 (1963) (seminal case as to abrogation)). Interspousal immunity has been abrogated as to all personal injury actions in Iowa.

The Supreme Court of Kansas refused to adopt parent-child immunity in a case involving a motor tort. *Nocktonick v. Nocktonick*, 227 Kan. 758, 611 P.2d 135 (1981). The court opined: "We see no good reason why children should not enjoy the same right to protection and to legal redress for wrongs done them as others enjoy. We question the view that a regard for family harmony and tranquility necessitates denial of tort recovery to a child injured in an automobile accident." 611 P.2d at 140. The court limited its holding to motor torts, indicating other factual scenarios would be addressed as they develop. *Id.*, 611 P.2d at 142. The result of *Nocktonick* was short-lived as noted in *Guffy By And Through Reeves v. Guffy*, 230 Kan. 89, 631 P.2d 646 (1981). In discussing the *Nocktonick* decision it was noted that "[t]he legislature has now amended the Kansas Automobile Injury Reparations Act by enacting Senate Bill No. 371. Effective January 1, 1982, an insurer is given and will no doubt exercise its right in liability insurance policies to exclude coverage of 'any bodily injury to any insured or any family member of an insured residing in the insured's household.'" 631 P.2d at 650–51. *See* Kan.Stat.Ann. § 40–3107(i)(1) (1981), *but see* Kan.Stat.Ann. § 40–3107 (1981, Cum.Supp.1985) which no longer contains that exclusion. Interspousal immunity is still retained in Kansas.

In permitting a suit by a minor against his mother, the driver of the car involved in an accident, Kentucky formulated a new rule as to parent-child immunity. *Rigdon v. Rigdon*, 465 S.W.2d 921 (Ky.1971). The immunity was abrogated with two exceptions: "(1) where the negligent act relied on for a recovery involves the reasonable exercise of

parental authority over the child, and (2) where the alleged negligent act involves the exercise of ordinary parental discretion with respect to provisions for the care and necessities of the child." 465 S.W.2d at 923. Kentucky has abrogated, in full, interspousal immunity.

In *Black v. Solmitz*, 409 A.2d 634 (Me.1979), the Supreme Judicial Court of Maine held that the rule upholding parent-child immunity in full was "counterproductive in achieving the purpose of promoting family harmony or parental autonomy in the governance of minor children." 409 A.2d at 639. Although a motor tort was at issue in *Black*, the court refused to limit its abrogation to either auto torts or the extent of the parents' insurance. The court did state that to "the extent the so-called 'doctrine of parental immunity' reflects the idea that the parent-child relationship is a special one, in which parents should have a reasonably high degree of autonomy in carrying out their responsibilities for care and discipline of their children, we think the doctrine should have continuing vitality." *Id.* Maine has fully abrogated interspousal immunity.

The Massachusetts decision of *Sorensen v. Sorensen*, 369 Mass. 350, 339 N.E.2d 907 (1975) is often cited by jurisdictions opting to abrogate parent-child immunity as to motor torts. In that suit a minor child sued his mother for personal injuries received in an automobile accident. After reviewing the historical backdrop of parent-child immunity, the court noted "a marked trend toward abrogation or limitation of the doctrine of parental immunity ... in other jurisdictions." 339 N.E.2d at 911. This trend was said to be indicative of growing "judicial distaste" of the immunity. *Id.*, 339 N.E.2d at 912 (citation omitted). Noting its approval of those jurisdictions favoring abrogation, the Supreme Judicial Court of Massachusetts opined that "[c]hildren enjoy the same right to protection and to legal redress for wrongs done them as others enjoy. Only the strongest reasons, grounded in public policy, can justify limitation or abolition of those rights." *Id.*, 339 N.E.2d at 912. In rejecting the policy rationale that a lawsuit would disrupt

family harmony and tranquility, the court reasoned that "[t]he primary disruption to harmonious filial relations is not the lawsuit brought for damages after the injury but the injury itself, resulting from the misconduct of a parent." *Id.*, 339 N.E.2d at 913. Denying the injured child access to the courts will not then aid family reconciliation. *Id.* The court also noted that children have always been permitted to sue their parents in contract or over disputed property. *Id.*, 339 N.E.2d at 914. Moreover, tort actions often involve insurance, hence, the action between the parent and child would not be truly adversary. *Id.*

The court did note the possibility of collusion, but was confident that insurance company investigations as well as criminal statutes rendering such attempts punishable offenses would curb such attempts. *Id.*, 339 N.E.2d at 915.

The *Sorenson* court limited the abrogation to the auto tort context noting "that there may be parental exercises of discretion and authority which should be immune from scrutiny in a court of law." *Id.*, 339 N.E.2d at 916. Massachusetts has also abrogated interspousal immunity as to motor torts.

Michigan abrogated parent-child immunity as to motor torts in *Sweeney v. Sweeney*, 402 Mich. 234, 262 N.W.2d 625 (1978). Parents generally are not responsible for negligent supervision because there are two exceptions to the state's abrogation, including the exercise of reasonable parental authority and/or reasonable parental discretion as to the necessities of life (*e.g.*, food, clothing, housing and medical care). *Wright v. Wright*, 134 Mich.App. 800, 351 N.W.2d 868, 870 (1984) (citation omitted). Interspousal immunity has been totally abrogated in Michigan.

In a certified question from a federal district court, the Supreme Court of Montana also permitted an unemancipated minor to sue a parent for injuries arising from an automobile accident. *Transamerica Ins. Co. v. Royle*, 202 Mont. 173, 656 P.2d 820 (1983). This was a case of first impression in the state. In deciding to permit the suit, the

court reasoned that "[t]o allow such an action does not undermine parental authority and discipline, nor does it threaten to substitute judicial discretion for parental discretion in the care and rearing of minor children. We must recognize that there may be parental exercises of discretion and authority which would deserve special protection in a court of law." 656 P.2d at 824. Accordingly, the court limited its decision to the factual scenario of an auto tort. It further held that household exclusions were invalid. The interspousal immunity rule remains valid in Montana.

New Hampshire has also permitted unemancipated minors to sue their parents for personal injuries arising out of automobile accidents. *Briere v. Briere*, 107 N.H. 432, 224 A.2d 588 (1966). Although there is some risk of collusion the court was confident that any such "chicanery" could be handled by the judicial system. 224 A.2d at 590. As to the popular rationale that such a suit would deplete family resources, the court noted "that if the father has means, he will almost inevitably carry insurance, and if he has not, the chances of anyone bringing suit for the child are remote." *Id.* Hence, the existence of insurance was a factor to consider as to both family resource and harmony. The court reasoned that a suit for personal injuries in which an insurance policy existed would be far less disruptive than a contract or property action "where the parent would ordinarily have to pay a verdict from his own pocket." *Id.*, 224 A.2d at 591. Interspousal immunity is fully abrogated in New Hampshire.

North Carolina has effected a partial abrogation of the parent-child immunity through a statute, which provides: "The relationship of parent and child shall not bar the right of action by a person or his estate against his parent for wrongful death, personal injury, or property damage arising out of operation of a motor vehicle owned or operated by the parent." N.C.Gen.Stat. § 1–539.21 (1983 Repl.Vol., 1985 Cum.Supp.). Interspousal immunity has been fully abrogated in North Carolina.

Oklahoma, viewing the existence of mandatory liability insurance as "significant," also abrogated parental immunity as to motor torts. *Unah By And Through Unah v. Martin,* 676 P.2d 1366 (Okla.1984). "Today, where all other passengers in a car are mandatorily protected by liability coverage it is unfair and against public interest to deprive an unemancipated minor the benefit of recovery." 676 P.2d at 1370. The court further observed "that familial harmony is more likely to be disturbed where the family's fund is depleted because the proceeds from the liability insurance cannot be reached." *Id.* Finally, the possibility of fraud or collusion is not a sufficient reason to justify a blanket denial. *Id.* at 1369. *See also Hooper By And Through Hooper v. Clements Food,* 694 P.2d 943 (Okla.1985) (unemancipated minor may fully recover damages from parent's employer when injured as a result of parent's negligence within course and scope of employment); *but cf. Sixkiller v. Summers,* 680 P.2d 360, 362 (Okla.1984) (court declined to abrogate immunity in a case involving parental discretion/supervision because such litigation "would adversely affect the family relationship by intruding upon the authority and discretion of parents in rearing and caring for their children."). The interspousal immunity rule has been fully abrogated in Oklahoma.

Rhode Island abrogated the parent-child immunity as to motor torts, but noted that "there may be parental exercises of discretion and authority which should be immune from judicial scrutiny." *Silva v. Silva,* 446 A.2d 1013, 1016 (R.I.1982). There is no question of parental control in an auto tort however, and the existence of liability insurance tempers the possibility of family discord and the availability of insurance monies may avoid the depletion of family resources. *Id.* at 1015. Interspousal immunity is also abrogated as to motor torts.

Virginia recognizes several exceptions to the parent-child immunity rule, including motor torts. *Wright v. Wright,* 213 Va. 177, 191 S.E.2d 223 (1972) (citing *Smith v. Kaufman,* 212 Va. 181, 183 S.E.2d 190 (1971)). Other exceptions

include: (1) an emancipated child; (2) a child engaged in a master-servant relationship with a parent; (3) an injury received by a child when the parent was acting within scope of employment; and (4) when the parent-child relationship is purely incidental—such as when the parent is a common carrier and the child is one of several passengers. Failure to "discharge the normal parental duty for supervising and providing a safe place for the child to play" is covered by the immunity. *Wright*, 191 S.E.2d at 225. In Virginia interspousal immunity is abrogated as to motor torts.

Opting to follow the "modern trend," Washington has also abrogated parent-child immunity, at least as to motor torts. *Merrick v. Sutterlin*, 93 Wash.2d 411, 610 P.2d 891 (1980). As to all other factual scenarios, the court adopted a case-by-case approach "to develop the details of any portions of the immunity...." 610 P.2d at 893. Interspousal immunity has been fully abrogated in Washington.

West Virginia abrogated parent-child immunity in the context of motor torts. "In the realm of automobile cases we cannot brush aside or ignore the almost universal existence of liability insurance," thereby negating the family tranquility argument. *Lee v. Comer*, 159 W.Va. 585, 224 S.E.2d 721, 723 (1976). Moreover, minors should "enjoy the same right to legal redress for wrongs done to them as others enjoy." *Id.*, 224 S.E.2d at 723 (citation omitted). West Virginia has abrogated, in full, interspousal immunity.

Wyoming has essentially abrogated parent-child immunity as to motor torts by holding household exclusions invalid. "The effect of this holding is to find that Wyoming's compulsory insurance statute overrules the former holdings of this court which recognize intra-family and interspousal immunity to and including the minimum requirements contained in the financial responsibility law and the uninsured motor vehicles act." *Allstate Ins. Co. v. Wyoming Ins. Dept.*, 672 P.2d 810, 814 (Wyo.1983). *See also Meyer v. State Farm Mut. Auto. Ins. Co.*, 689 P.2d 585 (Colo.1984)

(en banc) wherein it was held that household exclusions in automobile insurance policies were invalid. *Meyer* did not involve a child versus parent action, but it did cite *Trevarton v. Trevarton*, 151 Colo. 418, 378 P.2d 640 (1963) as eliminating intra-family tort immunity. At issue in *Trevarton*, however, was only the right of a minor to sue a parent for negligence related to the discharge of a business duty— as opposed to a parental duty. Hence, the status of the immunity in Colorado is unclear. Interspousal immunity has been totally abrogated there.

In sum, at least 20 jurisdictions have abrogated parent-child immunity, in part, specifically as to motor torts. Furthermore, other jurisdictions have abrogated the immunity in part by designating those areas in which the immunity still exists. Arguably, these designated exceptions to the immunity would not encompass an action in negligence arising from an automobile accident. The seminal case in this area is the Wisconsin decision of *Goller v. White*, 20 Wis.2d 402, 122 N.W.2d 193 (1963). In that case, the minor child was injured by a bolt protruding from his parents' tractor. After reviewing various arguments, the Supreme Court of Wisconsin decided that parent-child immunity

> ought to be abrogated except in these two situations: (1) where the alleged negligent act involves an exercise of parental authority over the child; and (2) where the alleged negligent act involves an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care.

122 N.W.2d at 198. "Accordingly the rule is abolished in personal injury actions subject to these noted exceptions." *Id.* The court acknowledged that the "wide prevalence" of liability insurance was considered in rendering its policy decision as to partial abrogation. Wisconsin fully abrogated the interspousal tort immunity over fifty years ago.

At least three other states [3] have adopted the Wisconsin approach—Kentucky, New Jersey and Michigan. It should be noted that Minnesota once followed the two-part exception, but later rejected it in favor of the "reasonable parent" standard. Kentucky adopted the partial abrogation in *Rigdon v. Rigdon,* 465 S.W.2d 921 (Ky.1971) (discussed *supra* ). The two exceptions, that is, the two activities that remain immune, are the reasonable exercises of parental authority and the exercise of ordinary parental discretion with respect to the necessaries of life. A similar rule is in place in Michigan as delineated in *Wright v. Wright,* 134 Mich.App. 800, 351 N.W.2d 868, 870 (1984). In *Wright* a father was immune from negligence suit instituted by his daughter regarding a self-inflicted accidental gunshot wound suffered by the daughter. The litigation sounded in "negligent supervision," therefore, the father was immune under the two-part exception as to parental authority and discretion as to necessaries.

Both the Michigan and Kentucky cases reference automobile torts. Suits relating to personal injuries arising from a motor tort are actionable, *i.e.,* outside the purview of the immunity. Although the New Jersey case of *Foldi v. Jeffries,* 93 N.J. 533, 461 A.2d 1145 (1983) did not arise within the factual setting of a motor tort, the language employed by the court seems to indicate that such a suit would not be immune. Specifically, New Jersey has maintained the parent-child immunity "in the areas involving the exercise of parental authority or the provision of customary child care." 461 A.2d at 1152. Although the wording is somewhat modified or simplified, the import of this two-part exception is essentially the same as *Goller,* the seminal case out of Wisconsin. It is left to the lower courts to determine *if* the facts of a particular case fit within the exceptions. As to "negligent supervision," the doctrinal exceptions will protect the parent in a case of simple negligence, but it will

---

3. *See also Felderhoff v. Felderhoff,* 473 S.W.2d 928 (Tex.1971) (discussed *infra* pp. 580–583).

not immunize "a parent who has willfully or wantonly failed to watch over his or her child." *Id.* As have so many other states, New Jersey has fully abrogated interspousal immunity.

The District of Columbia, in a case of first impression, adopted parent-child immunity but subjected the immunity to a number of exceptions. *Dennis v. Walker,* 284 F.Supp. 413 (D.D.C.1968). In *Dennis,* the federal district court held that a defendant sued by a minor for personal injuries cannot maintain an action for contribution against the minor-plaintiff's parents on the ground that they were joint tortfeasors. The District of Columbia, as previously indicated, delineated exceptions to the immunity. The immunity is inapplicable if: (1) the conduct at issue is deemed to be willful or wanton, (2) the injury arose while the parents were acting within the scope of their employment; or (3) the suit is instituted against the estate of either a deceased parent or child. The District of Columbia retains interspousal immunity.

The State of Idaho has indicated its unwillingness to adopt a "categorical rule that universally prohibits parent-child actions on the basis of a total and absolute parental immunity." *Pedigo v. Rowley,* 101 Idaho 201, 610 P.2d 560, 564 (1980). In *Pedigo* a minor child alfoat on a raft in a lake, was struck and injured by a speed boat. The owners and operator of the speed boat instituted a third party action against the minor's father for negligent supervision. In disallowing that particular claim the court stated: "We believe that the integrity of the family plays an essential role in the welfare of our society. To that extent, we agree with those jurisdictions which still retain the doctrine of parental immunity." 610 P.2d at 564. But, the court was unwilling to state that no exceptions would be recognized; however, no indication was given as to when the immunity would be relaxed.

Illinois has also recognized exceptions to the parent-child immunity. Previously, Illinois courts maintained the immu-

nity as a "matter of public policy due to the interests of the State in maintaining harmony within the family." *Mroczynski v. v. McGrath,* 34 Ill.2d 451, 216 N.E.2d 137, 139 (1966). Illinois modified the parent-child immunity because the "public policy considerations favoring the promotion of family harmony and the prevention of intrafamily litigation and strife ... will not be served." *Larson v. Buschkamp,* 105 Ill.App.3d 965, 61 Ill.Dec. 732, 735, 435 N.E.2d 221, 224 (1982). For example, there is no immunity as to: (1) willful and wanton misconduct; (2) when the family relationship is dissolved by death; (3) a breach of duty to the public at large—as opposed to a duty related to a familial relationship; (4) duty to keep trees and bushes trimmed to permit a clear view of the street and/or sidewalk; and (5) an action for contribution against a parent is permissible. As to the fifth exception, the court noted that "[t]he widespread use of liability insurance mitigates against the possibility that such suits disrupt the domestic peace or deplete the family's financial resources." 61 Ill.Dec. at 736, 435 N.E.2d at 225. This language suggests direct suits as to personal injuries from motor torts would be permissible. Interspousal immunity is statutorily retained in Illinois as to all torts except an intentional tort. Ill.Rev.Stat.Ann. Ch. 40, § 1001 (1980, Cum.Supp.1985).

Finally, the state of Texas has also abrogated parent-child immunity in part. In *Felderhoff v. Felderhoff,* 473 S.W.2d 928 (Tex.1971) the court held that the general rule of parental immunity is not applicable "[o]nce a child has become an employee in the business vocation of his parent or his parent's business partnership...." *Id.* at 930. When acting in a business setting, parents are not discharging "normal parental duties and responsibilities." *Id.* at 933. In recognition of the public policies of peace, tranquility and discipline in the home, the immunity was retained "with respect to alleged acts of ordinary negligence which involve a reasonable exercise of parental authority or the exercise of ordinary parental discretion with respect to provisions for the care and necessities of the

child." 473 S.W.2d at 933. This language would seemingly permit a suit for personal injuries arising from a motor tort. Texas has retained, however, interspousal immunity to all but intentional torts.