766 A.2d 598

**William B. BUSHEY, Personal Representative of the Estate of Miranda L. Bushey, et al.,**

v.

**NORTHERN ASSURANCE COMPANY OF AMERICA, et al.**

**No. 19, Sept. Term, 2000.**

Court of Appeals of Maryland.

Feb. 8, 2001.

628

Michael J. Schreyer (Donahue, Seidman & Schreyer, LLC, on brief), Waldorf, for petitioners.

Mark T. Mixter (John M. Oliveri of Law Office of Mark T. Mixer, on brief), Baltimore, for respondents.

Argued Before BELL, C.J., ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL and HARRELL, JJ.

RODOWSKY, Judge.

In this review of a declaratory judgment, we consider two issues: first, the interpretation of an uninsured/underinsured motorist (UM/UIM) endorsement and, second, parent-child tort immunity where the defendant child is deceased.

On January 25, 1997, a tragic automobile accident resulted in the deaths of two sisters, Miranda L. Bushey (Miranda), a high school sophomore, and Susan C. Bushey (Susan), a high school senior. The accident occurred while Susan was driving a 1983 Cadillac Cimarron in which Miranda was riding as a passenger. The Cadillac was owned by the sisters' grandfather, Earl T. Weeks (Weeks). Susan crossed a double yellow line while attempting to pass a slower moving vehicle and struck an oncoming vehicle head-on. She died within one-half hour after the accident, and Miranda died from her injuries five days later. At the time of the accident, the Cadillac was insured under a Nationwide Mutual Insurance Company motor vehicle liability policy with limits of $20,000/$40,000. The

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

policy was issued to Weeks, and Susan was a named insured under it.

Also in effect at the time of the accident was a commercial lines policy that William B. Bushey (Bushey), the father of Susan and Miranda, had purchased from the respondent, Northern Assurance Company of America (Northern), for his gasoline station and automotive repair business. Northern's policy contains UM/UIM provisions. The limit for that coverage is $1,000,000.

Bushey and his wife, Linda K. Bushey, (jointly, the Parents) have asserted a wrongful death claim against the Estate of Susan. Bushey, as Personal Representative of the Estate of Miranda, also has asserted a survival claim against the Estate of Susan. The Parents, individually, and Bushey, as Personal Representative of the Estate of Miranda, are the petitioners in this Court (the Petitioners).

A controversy exists between the Petitioners and Northern concerning coverage under the UM/UIM provisions of Northern's policy for the claims asserted by the Petitioners against Susan's estate. To resolve the controversy the Petitioners instituted in the Circuit Court for Charles County a declaratory judgment action which named Northern as a defendant. Northern denied coverage and, alternatively, asserted that Susan had no liability to the Parents on the wrongful death claim because of parent-child immunity. The circuit court entered judgment in favor of Northern.[1]

Petitioners appealed to the Court of Special Appeals which affirmed. *Bushey v. Northern Assurance Co.,* 130 Md.App. 169, 745 A.2d 444 (2000). That court gave two reasons in support of its holding that there was no coverage. First, it said that Bushey's sole proprietorship, the named insured under the commercial lines policy, was "a business entity, not an individual," so that a critical definition in the policy concerning "family members" was said not to apply. *Id.* at 178, 745 A.2d at 449. Further, the court construed the UM/UIM endorse-

---

1. We discuss this judgment more particularly in Part III, *infra* .

ment in the context of the entire policy as, in effect, unambiguously requiring that the motor vehicle occupied by Miranda at the time of the fatal accident be a "covered 'auto'" that was scheduled in the "Garage Declarations" of the "Commercial Auto Coverage Part" of the Northern policy. The Court of Special Appeals also held that parent-child immunity applied. *Id.* at 178–81, 745 A.2d at 449–50.

Petitioners sought certiorari review in this Court, which we granted. *Bushey v. Northern Assurance*, 358 Md. 608, 751 A.2d 470 (2000). As explained below, we disagree on the interpretation of the policy with respect to the coverage issue, and we disagree as to the immunity issue.[2]

## I

### A

In *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 667 A.2d 617 (1995), we summarized the rules for interpretation of insurance policies that apply here. There we said:

"In Maryland, insurance policies, like other contracts, are construed as a whole to determine the parties' intentions. *Cheney v. Bell National Life [Ins. Co.]*, 315 Md. 761, 766–67, 556 A.2d 1135[, 1138] (1989). Words are given their 'customary, ordinary, and accepted meaning,' unless there is an indication that the parties intended to use the words in a technical sense. Id., see also *Chantel Associates v. [Mount ] Vernon [Fire Ins. Co.]*, 338 Md. 131, 142, 656 A.2d 779[, 784] (1995). 'A word's ordinary signification is tested by what meaning a reasonably prudent layperson would attach to the term.' *Bausch & Lomb [Inc.] v. Utica Mutual [Ins. Co.]*, 330 Md. 758, 779, 625 A.2d 1021[, 1031] (1993). If the language in an insurance policy suggests more than one meaning to a reasonably prudent layperson, it is ambiguous.

---

**2.** Our disposition of the coverage issue on policy interpretation grounds makes it unnecessary for us to consider the Petitioners' argument based on Maryland Code (1997), § 19–509 of the Insurance Article, an argument that was rejected by the Court of Special Appeals. *Bushey,* 130 Md.App. at 174–77, 745 A.2d at 447–48.

*Collier v. MD–Individual Practice [Ass'n ]*, 327 Md. 1, [6,] 607 A.2d 537[, 539] (1992); *Pacific Indem. [Co.] v. Interstate Fire & Cas. [Co.]*, 302 Md. 383, [389,] 488 A.2d 486[, 489] (1985). A term which is clear in one context may be ambiguous in another. *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 74, 517 A.2d 730[, 732] (1986); *Bentz v. Mutual Fire [, Marine & Inland Ins. Co.]*, 83 Md.App. 524, 537, 575 A.2d 795[, 801] (1990).

"Where terms are ambiguous, extrinsic and parol evidence may be considered to ascertain the intentions of the parties. *Cheney, supra,* 315 Md. at 766–67, 556 A.2d [at 1138]. 'Maryland does not follow the rule, adopted in many jurisdictions, that an insurance policy is to be construed most strongly against the insurer.' *Id.* Nevertheless, 'if no extrinsic or parol evidence is introduced, or if the ambiguity remains after consideration of the extrinsic or parol evidence that is introduced, it will be construed against the insurer as the drafter of the instrument.' *Id.; see also, e.g., Collier, supra,* 327 Md. at 5–6, 607 A.2d [at 539]; *Mut[ual] Fire, Marine & Inland Ins. [Co.] v. Vollmer,* 306 Md. 243, 251, 508 A.2d 130[, 134] (1986); *St. Paul Fire & Mar. Ins. [Co.] v. Pryseski,* 292 Md. 187, 193–96, 438 A.2d 282[, 285–87] (1981); *Truck Ins. Exch. v. Marks Rentals,* 288 Md. 428, 435, 418 A.2d 1187[, 1191] (1980); *Aragona v. St. Paul Fire & Mar. Ins. [Co.],* 281 Md. 371, 375, 378 A.2d 1346[, 1349] (1977)."

*Id.* at 508–09, 667 A.2d at 619.

Northern's policy contains "COMMON POLICY DECLARATIONS" which, by a Policy Change Endorsement, identify the named insured as "William B. Bushey t/a Bushey's Automotive." The policy is divided into three sections: a property section insuring the building out of which the business was conducted and insuring personal property stored in that building, a crime section insuring against theft and employee dishonesty, and a "COMMERCIAL AUTO COVERAGE PART." The "GARAGE DECLARATIONS" of that part inquire as to the "Form of Business," followed by four blocks respectively labeled "Individual," "Partnership," "Corpora-

tion," and "Other." The block identifying the form of business as "Individual" was checked.

The "GARAGE DECLARATIONS" contain a chart consisting of four columns, "Coverages," "Covered Autos," "Limit," and "Premium." Among the coverages offered and purchased were "Uninsured Motorists" and "Underinsured Motorists." Under the "Covered Autos" column, on the lines referring to UM/UIM coverage were inserted the numerals "26" and "32." These insertions were pursuant to a direction under the heading, "Covered Autos," reading: "(Entry of one or more of the symbols from the COVERED AUTOS Section of the Garage Coverage form shows which autos are covered autos)." The "GARAGE COVERAGE FORM" in "Section I–Covered Autos" converts code "26" to

"OWNED 'AUTOS' SUBJECT TO A COMPULSORY UNINSURED MOTORISTS LAW." Only those 'autos' you own that because of the law in the state where they are licensed or principally garaged are required to have and cannot reject Uninsured Motorists Coverage...." [3]

The policy also contains a "vehicle schedule" which lists three vehicles, a 1994 Ford Explorer, a 1984 Ford Pickup, and a 1986 Ford "Rollback." Each of these is described on the schedule as "Titled to Business."

Section II of the Commercial Auto Coverage Part of the policy deals with liability coverage, § III with garage keepers coverage, § IV with physical damage coverage, § V with garage conditions, and § VI with definitions. In § VI " 'Insured' means any person or organization qualifying as an insured in the Who Is an Insured provision of the applicable coverage." The Commercial Auto Coverage Part of the policy contains a number of endorsements, *e.g.*, auto medical payments coverage and a "Maryland Personal Injury Protection Endorsement." Our principal concern here is with the en-

---

**3.** At oral argument in this Court we were advised by counsel for Northern that code "32" has no relevance to the issues in this case.

dorsement titled, "Maryland Uninsured Motorists Coverage" (the Endorsement).

The Endorsement is headed by a notice reading, "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." Immediately below its title the Endorsement reads: "For a covered 'auto' licensed or principally garaged in, or 'garage operations' conducted in Maryland, this Endorsement modifies insurance provided under the following." Included among "the following" are the "BUSINESS AUTO COVERAGE FORM" and the "GARAGE COVERAGE FORM."

■ Based on the above provisions, Northern argues that the UM/UIM coverage is limited to claimants who suffer bodily injury while occupying a covered vehicle. Northern's position, however, does not take into account the provisions of the policy, set forth below, on which the Petitioners rely. Part "A. COVERAGE" of the Endorsement provides in ¶ 1 as follows:

> "We will pay all sums the 'insured' is legally entitled to recover as damages from the owner or driver of an 'uninsured motor vehicle.' The damages must result from 'bodily injury' sustained by the 'insured' . . . caused by an 'accident'. . . ." [4]

Part B defines "WHO IS AN INSURED" under the Endorsement. Part B reads:

"1. You.

"2. *If you are an individual, any 'family member.'*

"3. Anyone else 'occupying' a covered 'auto' or a temporary substitute for a covered 'auto'. The covered 'auto' must be out of service because of its breakdown, repair, loss or destruction.

---

4. By definition in Part F, ¶ 4 an "uninsured motor vehicle" includes an "underinsured motor vehicle."

"4. *Anyone for damages he or she is entitled to recover because of 'bodily injury' sustained by another 'insured'.*"

(Emphasis added).

The Endorsement, in Part F, presents "ADDITIONAL DEFINITIONS [a]s used in this endorsement." Paragraph 1 of Part F defines the term "[f]amily member" as "a person related to you by blood, marriage or adoption who is a resident of your household, including a ward or foster child."

The exclusions from UM/UIM coverage under the policy are set forth in Part C of the Endorsement which, in relevant part, excludes:

"3. 'Bodily injury' sustained by:

"a. You while 'occupying' or when struck by any vehicle owned by you that is not a covered 'auto' for Uninsured Motorists Coverage under this Coverage Form;

"b. Any 'family member' while 'occupying' or when struck by *any vehicle owned by that 'family member'* that is not a covered 'auto' for Uninsured Motorists Coverage under this Coverage Form; or

"c. Any 'family member' while 'occupying' or when struck by any vehicle owned by you that is insured for Uninsured Motorists Coverage on a primary basis under any other Coverage Form or policy."

(Emphasis added).

Petitioners' reading looks primarily to Part B of the Endorsement. Petitioners say that the named insured ("You") is Bushey, an individual, and that Miranda was a "family member." Accordingly, Miranda was an "insured" under the insuring clause of the Endorsement, there is no exclusion that applies to her, and the UM/UIM coverage applies to the claim of her estate. Similarly, and assuming that Susan's estate would be liable to the Parents, the wrongful death claim of the Parents is because of the "bodily injury" sustained by Miranda and would be covered by Part B, ¶ 4 of the Endorsement. Miranda's "bodily injury" is not excluded from the UM/UIM

coverage because, although she was occupying an auto that was not a covered auto, the exclusion for claims by a family member injured while occupying a non-covered vehicle is subject to the further limitation that the non-covered vehicle be owned by the injured family member. *See* Endorsement, Part C, ¶ 3.b.

Northern's reading of the policy, under which the entire Endorsement is limited by its introduction to a "covered 'auto'" renders Part B, ¶ 3 redundant. If, regardless of relationship to the named insured, all claimants for UM/UIM benefits must have been occupants of a "'covered auto,'" it becomes totally unnecessary to specify in Part B, ¶ 3 that payment of those benefits for "anyone else," *i.e.*, other than the named insured or a "family" member of the named insured, depended on "'occupying' a covered 'auto.'" Similarly, it would have been unnecessary to exclude from "[b]odily injury" in Part C, ¶ 3.b an injury sustained by a family member in "any vehicle owned by that family member that is not a covered 'auto,'" if occupying any non-covered auto, in and of itself, would exclude coverage.

The references to covered autos in the general structure of the policy on which Northern relies at best create an ambiguity. No extrinsic evidence has been offered to resolve the ambiguity. Accordingly, if Bushey is the insured and if Miranda is a "family member," there is coverage, because the ambiguity, if any, concerning occupying a "covered 'auto'" is resolved against Northern.

## B

■ The "you" of the policy is not a business entity separate from Bushey. The amendment to the policy identifies the insured as "William Bushey t/a Bushey's Automotive Repair." Northern does not dispute that Bushey's Automotive Repair is a sole proprietorship wholly owned by Bushey. Nevertheless, Northern argues that the policy was a commercial policy issued for a business and that it did not cover Bushey as an individual. Northern's argument, simply put, is wrong.

■ The sole proprietorship form of business provides "complete identity of the business entity with the proprietor himself. . . ." 1 Z. Cavitch, *Business Organizations* § 1.04[1], at 1–23 (Matthew Bender 2000). "Bushey's Automotive Repair" has no legal existence apart from its owner, Bushey. *See Romans v. State*, 178 Md. 588, 597, 16 A.2d 642, 646 (1940), *cert. denied*, 312 U.S. 695, 61 S.Ct. 732, 85 L.Ed. 1131 (1941) ("If there is no statute to the contrary, a person may adopt any name by which he may become known, and by which he may transact business and execute contracts and sue or be sued. And this without regard to his true name. Hence, if a person adopt or assume a name whereby he becomes known, so that the adopted or assumed name is sufficient for his identification, he may be prosecuted in his adopted or assumed name." (Citations omitted)).

Numerous decisions recognize in the insurance context the identity of the sole proprietor with the trade name adopted by the sole proprietor. *See O'Hanlon v. Hartford Accident & Indem. Co.*, 639 F.2d 1019, 1025 (3d Cir.1981) ("We [hold] . . . that where an insured purchases a policy in a trade name, the policy will be viewed as if issued in his given name"); *Duval v. Midwest Auto City, Inc.*, 425 F.Supp. 1381, 1387 (D.Neb.1977), *aff'd*, 578 F.2d 721 (8th Cir.1978) ("The designation 'd/b/a' means 'doing business as' but is merely descriptive of the person or corporation who does business under some other name. Doing business under another name does not create an entity distinct from the person operating the business"); *Pinkerton's, Inc. v. Superior Court of Orange County*, 49 Cal. App.4th 1342, 57 Cal.Rptr.2d 356, 360 (1996) ("Use of a fictitious name does not create a separate legal entity"); *Providence Washington Ins. Co. v. Valley Forge Ins. Co.*, 42 Cal.App.4th 1194, 50 Cal.Rptr.2d 192, 195 (1996) ("The business name is a fiction, and so too is any implication that the business is a legal entity separate from its owner"); *Chmielewski v. Aetna Cas. & Sur. Co.*, 218 Conn. 646, 591 A.2d 101, 113 (1991) ("We also agree that one who operates a business under a trade name is nonetheless an individual insured under a policy issued in that trade name"); *Samples v. Georgia Mut.*

*Ins. Co.,* 110 Ga.App. 297, 138 S.E.2d 463, 465–66 (1964) (Exclusion from coverage for temporary substitute vehicle of any vehicle owned by spouse applied to exclude vehicle titled in spouse's trade name); *Georgantas v. Country Mut. Ins. Co.,* 212 Ill.App.3d 1, 156 Ill.Dec. 394, 570 N.E.2d 870, 873 (1991) ("The universal rule is that the sole proprietor is personally responsible for the activities of the business"); *Trombley v. Allstate Ins. Co.,* 640 So.2d 815, 817 (La.Ct.App.1994) ("[A] trade name has no separate existence apart from the individual doing business under that trade name"); *Gabrelcik v. National Indem. Co.,* 269 Minn. 445, 131 N.W.2d 534, 536 (1964) ("Whether the vehicle is registered in the husband's name or in the name of the business which he owns and operates as a sole proprietorship, the result is the same; namely, that this vehicle was owned by the insured's spouse who resided in the same household"); *Carlson v. Doekson Gross, Inc.,* 372 N.W.2d 902, 905 (N.D.1985) ("A sole proprietorship which is conducted under a trade name is *not* a separate legal entity"); *Recalde v. ITT Hartford,* 254 Va. 501, 492 S.E.2d 435, 438 (1997) ("The weight of authority in other jurisdictions has applied the concept that the individual owner and the proprietorship are a single entity in insurance contexts"). Cf. *Consolidated American Ins. Co. v. Landry,* 525 So.2d 567, 569 (La.Ct.App.1988) ("[The policy] clearly provides coverage ... only with respect to his sole proprietorship"); *Hertz Corp. v. Ashbaugh,* 94 N.M. 155, 607 P.2d 1173, 1175 (Ct.App.1980) ("[Proprietor], individually, was not the 'named insured' under the policy, and any vehicle owned by [the proprietor] individually was not a vehicle owned by the [proprietor d/b/a sole proprietorship], for purposes of application and construction of the insurance policy").

Northern primarily relies upon *Jensen v. United Fire & Cas. Co.,* 524 N.W.2d 536 (Minn.Ct.App.1994), a decision that interpreted precisely the same language used in the Endorsement. In *Jensen,* a twelve year old girl, Katie Jensen, suffered severe injuries while riding in an uninsured pickup truck, owned by the father of a friend, that was involved in a single-

vehicle accident. *Id.* at 537. The commercial policy in issue in that case provided:

"We will pay all sums the '*insured*' is legally entitled to recover as compensatory damages from the owner or driver of an 'uninsured' or 'underinsured motor vehicle' caused by an 'accident.' "

*Id.* at 539. The declarations page identified the "Named Insured" as "EAGLE EXCAVATING JENSEN ROGER DBA." *Id.* at 539–40. The policy then described an " 'insured' " as: " '1. You. 2. *If you are an individual,* any "family member." ' " *Id.* at 540. The Minnesota intermediate appellate court held that "Eagle Excavating, the named insured in this 'commercial' policy, is not an individual; it is a business. Hence, the policy does not apply to Katie Jensen and summary judgment for United Fire was proper." *Id.* No authority was cited in support of this conclusion.

The few reported cases that deal specifically with UM/UIM coverage in policies naming a sole proprietorship as the insured find, with the major exception of *Jensen,* that the language referring to family members in the uninsured motorist endorsement renders the policy ambiguous. For example, in *American Bankers Ins. Co. v. Stack,* 208 N.J.Super. 75, 504 A.2d 1219 (Law Div.1984), the policy had been issued to Mobile Wash Systems, a business that was a sole proprietorship, but the individual owner was not named in the policy. The sole proprietor's son was injured while a passenger in a non-covered truck, owned by another person, and not used in the business of Mobile Wash Systems. The son sought to recover uninsured motorist benefits under the policy issued to Mobile Wash Systems. *Id.* at 1219. In holding that the policy provided UM/UIM coverage for the proprietor's son, the Court stated:

"The issuance of an insurance policy to a trade-name business gives rise to disputes regarding coverage in the absence of clarifying language. It is clear that nowhere in the insurance policy issued by plaintiff to Mobile Wash Systems is it expressly stated that the policy is purely for commercial use. Item No. 6 of the policy states that the

purposes for which the automobiles are to be used are 'pleasure and business.' The definition of 'insured' in the UM endorsement reads as if the named insured is a natural person. There is also no express exclusion of family members of unincorporated business enterprises."

*Id.* at 1221. Therefore, the New Jersey court found that the policy was ambiguous and construed it against the insurer. *Id.*

In *Purcell v. Allstate Ins. Co.,* 168 Ga.App. 863, 310 S.E.2d 530 (1983), a " 'business auto policy' " was issued to " 'Purcell Radiator Serv.,' " identified in the policy as an " 'individual' business." *Purcell,* 310 S.E.2d at 531. The wife of the business owner had been struck as a pedestrian by an underinsured vehicle. *Id.* She claimed under the UIM coverage as a "family member" of the named insured. Finding that the language regarding " 'family members' " did "not demonstrate that the intent of the policy was not to afford the [personal] coverage sought," *id.* at 532, the court continued:

"While it is true that the endorsement provides that it is effective 'if' the named insured is an individual, there is no explanation as to why such an endorsement would be included in a 'business auto' policy issued to an 'individual' business. No explanation for the inclusion of this endorsement is readily apparent except the reasonable inference that the intent was to make what would otherwise be a 'business auto policy' issued to an 'individual' business in effect a 'personal' policy for at least some coverages afforded thereunder."

*Id.* at 532.

Somewhat analogous is *Aetna Cas. & Sur. Co. v. Hartford Accident & Indem. Co.,* 74 Md.App. 539, 539 A.2d 239 (1988), involving a "Garage Policy" issued by Hartford to " 'Sidney H. Cohen & Consumer Rent–A–Car t/a Wholesale Heaven.' " *Id.* at 543, 539 A.2d at 241. Hartford contended that the policy unambiguously provided liability coverage solely for the garage business known as Wholesale Heaven. *Id.* Aetna argued that the policy unambiguously provided liability coverage to Cohen, as an individual, because the declarations contained an

"X" next to the "Individual" designation and principally because the endorsement for personal injury protection provided individual coverage for members of Cohen's family by using a personal insurance form. *Id.* at 545–46, 539 A.2d at 242–43. The Court of Special Appeals found that the reference to family members rendered the policy ambiguous so that the trial court properly allowed extrinsic evidence to be introduced by Hartford. *Id.* Thus, judgment on a jury verdict in favor of Hartford was affirmed.

Northern refers us to certain cases involving corporations as the named insured where courts have held that the policy's inclusion of family members as additional insureds did not result in coverage. Initially we note that there is a considerable body of authority holding that including family members as additional insureds in a policy issued to a corporation as named insured *does* result in coverage for the family members, *see, e.g., Hawkeye–Security Ins. Co. v. Lambrecht & Sons, Inc.,* 852 P.2d 1317, 1319 (Colo.Ct.App.1993); *Ceci v. National Indem. Co.,* 225 Conn. 165, 622 A.2d 545, 550 (1993); *Home Folks Mobile Homes, Inc. v. Meridian Mut. Ins. Co.,* 744 S.W.2d 749, 750 (Ky.Ct.App.1987); *Carrington v. St. Paul Fire & Marine Ins. Co.,* 169 Wis.2d 211, 485 N.W.2d 267, 270 (1992), or for the officers, shareholders, and employees, *see, e.g., Hager v. American West Ins. Co.,* 732 F.Supp. 1072, 1075 (D.Mont.1989); *King v. Nationwide Ins. Co.,* 35 Ohio St.3d 208, 519 N.E.2d 1380, 1384 (1988). We need not express any opinion on this split of authority because the policy before us was issued to a sole proprietor. Consequently, the decisions relied upon by Northern are not on point.

Illustrative of the cases relied upon by Northern is *Economy Preferred Ins. Co. v. Jersey County Constr., Inc.,* 246 Ill.App.3d 387, 186 Ill.Dec. 233, 615 N.E.2d 1290 (1993). There the language in a "Preferred Business Auto Policy" issued to " 'Jersey County Construction, Inc.' " in terms extended uninsured motorist benefits to " 'family members.' " 186 Ill.Dec. 233, 615 N.E.2d at 1292. On the following rationale the court held that the policy did not insure the family of the corporate president.

"[W]e reach the conclusion that the insurance policy was not ambiguous. In doing so, after considering this case and the others cited herein, we cannot help but question why the form policies have not included a warning that the 'family member' reference does not apply when the insured is a corporation or similar-type nonfamily entity.

"The policy provides UM coverage benefits for those authorized drivers of the insured vehicles. Thus, if 'family members' were driving the vehicles, they would be covered. However, it still appears that 'family members' is a nullity when the insured is a corporation. Regardless, the policy lists the corporation as the insured of the 'Preferred Business Auto Policy.' To say the policy insured Nelson Miller, and thereby includes his family, would result in a rewriting of the policy. The named insured is not ambiguous; corporations cannot have family members. We hold that the policy is not ambiguous and that the trial court's decision was in error."

*Id.*, 186 Ill.Dec. 233, 615 N.E.2d at 1293–94.

In the case before us the Endorsement reasonably may be read as intended for use where the named insured is either a corporation or a sole proprietorship. The concern expressed by the Illinois court is addressed in the Endorsement by the introductory conditional clause in Part B, ¶ 2, "If you are an individual."

*Huebner v. MSI Ins. Co.*, 506 N.W.2d 438 (Iowa 1993), also cited by Northern, gives support to Petitioners' argument. That decision held that a child was not entitled to underinsured motorist coverage under a business auto policy issued to his father's corporate employer. *Id.* at 439. The decision, however, provided the following limitation:

"We are not persuaded that the result should be otherwise by the reasons expressed in the *Decker* [*v. CNA Ins. Co.*, 66 Ohio App.3d 576, 585 N.E.2d 884 (1990) ] or *Carrington* [*v. St. Paul Fire & Marine Ins. Co.*, 169 Wis.2d 211, 485 N.W.2d 267 (1992) ] decisions. Those cases found, improperly we believe, that a latent ambiguity is generated from using 'family member' language in policies issued to corpo-

rations. We believe that the only thing that this marketing practice suggests is that MSI's business auto policies were also written so as to be marketable to either individual proprietorships or to corporations. Assuming that individual proprietorships received certain coverages that corporations did not, that is so only because the contract specifies that it is so."

*Id.* at 441. In other words, in the view of the Iowa court, the inapplicability of the coverage provision in policies issued to corporate insureds would not make the coverage inapplicable in policies issued to sole proprietor insureds.[5]

For these reasons we hold that the named insured ("You") was Bushey, an individual, and that the trade name was nothing more than the name under which he chose to do business as an individual.

## C

Northern has raised an issue that was not decided by the courts below. That issue is whether Miranda was a "family

---

**5.** The remaining cases relied upon by Northern also involved policies issued to corporations. *See Marcello v. Moreau*, 672 So.2d 1104, 1105 (La.Ct.App.1996) ("While this language may be unnecessary and super-fluous it is obviously irrelevant since the named insured is a corporation"); *Barnes v. Thames*, 578 So.2d 1155, 1163 (La.Ct.App.), *writ denied*, 577 So.2d 1009 (1991) ("Since the named is a corporation, Daniel cannot be related by blood, adoption, or marriage to the named insured"); *Royal Ins. v. Bennett*, 226 A.D.2d 1074, 642 N.Y.S.2d 125 (1996) (UM/UIM claim by sole stockholder of named corporate insureds); *Truncali v. Fireman's Fund Ins. Co.*, 208 A.D.2d 826, 618 N.Y.S.2d 50, 50 51 (1994) (denying underinsurance benefits to daughter of corporation's owner because corporate policy provided coverage for " 'owned autos only' "); *Kitts v. Utica National Ins. Group*, 106 Ohio App.3d 692, 667 N.E.2d 30, 31 (1995), *appeal denied*, 74 Ohio St.3d 1513, 659 N.E.2d 1289 (1996) ("There, as here, the policy language clearly differentiated between corporate entities and individuals"); *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 459 (Tex.1997) (rejecting argument that references to family members in policy issued to corporation provided coverage for sole sharcholder's daughter). Recently, an intermediate appellate court in Illinois reached a similar conclusion. *Rohe v. CNA Ins. Co.*, 312 Ill.App.3d 123, 244 Ill.Dec. 442, 726 N.E.2d 38, 43 (2000) (holding business automobile policy issued to a corporation did not provide uninsured motorist coverage for owner's son).

member." The definition of that term in Part F, ¶ 1 of the Endorsement requires a family member to be "a resident of your household." It appears that Susan and Miranda stayed at the home of their grandparents on school days during the school year. Northern has preserved its opportunity to contend that, under the Maryland law of residency, Miranda was not a resident of Bushey's household. Accordingly, our mandate will remand for a determination of this issue.

## II

In § A.1 of the Endorsement, the insuring provision, Northern promises to pay "all sums the 'insured' is legally entitled to recover as damages from the owner or driver of an 'uninsured motor vehicle.'" In its answer to the declaratory judgment action Northern raised the issue of parent-child immunity. In effect, Northern asserted that the definition of an "insured" in Part B, ¶ 4 of the Endorsement ("Anyone for damages he or she is entitled to recover because of 'bodily injury' sustained by another 'insured'") did not apply to the Parents' wrongful death claim against Susan because of immunity. In response the Parents asked this Court to abrogate parent-child immunity where the claim is covered by automobile liability insurance and particularly where the defendant is deceased.

Since adopting, as a matter of Maryland common law, the doctrine of parent-child immunity in *Schneider v. Schneider,* 160 Md. 18, 152 A. 498 (1930), and applying it in *Yost v. Yost,* 172 Md. 128, 190 A. 753 (1937), this Court consistently has refused wholly to abrogate the doctrine. *See Eagan v. Calhoun,* 347 Md. 72, 81, 698 A.2d 1097, 1102 (1997); *Renko v. McLean,* 346 Md. 464, 480–81, 697 A.2d 468, 476 (1997); *Warren v. Warren,* 336 Md. 618, 626, 650 A.2d 252, 256–57 (1994); *Smith v. Gross,* 319 Md. 138, 145, 571 A.2d 1219, 1222 (1990); *Frye v. Frye,* 305 Md. 542, 543, 505 A.2d 826, 827 (1986).

The doctrine is limited to claims where the child in the relationship was unemancipated at the time of the alleged

wrongful conduct. *Waltzinger v. Birsner,* 212 Md. 107, 125–26, 128 A.2d 617, 626–27 (1957). To date, we have recognized three other limitations on the doctrine. It does not apply to the claim of a child against a parent who killed the other parent under circumstances constituting voluntary manslaughter or murder. *Eagan,* 347 Md. at 84–85, 698 A.2d at 1103–04. *Eagan* is an extension of the exception to the doctrine applied in *Mahnke v. Moore,* 197 Md. 61, 77 A.2d 923 (1951), where a child "suffered cruel or unusually malicious conduct at the hands of a parent." *Renko,* 346 Md. at 468 n. 4, 697 A.2d at 470 n. 4. Nor does the doctrine confer immunity on the business partner of the parent of an injured child. *Hatzinicolas v. Protopapas,* 314 Md. 340, 357–59, 550 A.2d 947, 956 (1988).

In addition to its application of the doctrine in the instant matter, the Court of Special Appeals has brought the parent-child immunity defense to bear in *Shell Oil Co. v. Ryckman,* 43 Md.App. 1, 3, 403 A.2d 379, 380–81 (1979), *Montz v. Mendaloff,* 40 Md.App. 220, 221, 388 A.2d 568, 569 (1978), *Sanford v. Sanford,* 15 Md.App. 390, 395, 290 A.2d 812, 816 (1972), and *Latz v. Latz,* 10 Md.App. 720, 730, 272 A.2d 435, 440–41, *cert. denied,* 261 Md. 726 (1971). Federal courts, on issues governed by Maryland law, have held the defense to be dispositive. *See Sherby v. Weather Bros. Transfer Co.,* 421 F.2d 1243, 1246 (4th Cir.1970); *Villaret v. Villaret,* 169 F.2d 677, 678 (D.C.Cir.1948); *Zaccari v. United States,* 130 F.Supp. 50, 53 (D.Md.1955). In the case before us we decline, once again, to accept the invitation totally to abrogate this well established doctrine.

A more substantial issue is presented by the Parents' argument based upon the relatively instantaneous death of Susan in the same accident which caused the death of Miranda five days later. Although this Court has given a number of reasons as a basis for parent-child immunity, "[o]ur primary concern with regard to matters involving the parent-child relationship [is] the protection of family integrity and harmony and the protection of parental discretion in the discipline and care of the child." *Frye,* 305 Md. at 551, 505 A.2d at 831. Parents submit that the public policy which the immunity is

intended to support is non-existent under the circumstances of the instant matter where there is no family relationship to preserve because the alleged tortfeasor is dead. This argument, that death had terminated the parent-child relationship, was made in *Smith*, 319 Md. 138, 571 A.2d 1219, but we were not required directly to address the argument under the facts in that case. *Mahnke*, 197 Md. 61, 77 A.2d 923, and *Eagan*, 347 Md. 72, 698 A.2d 1097, are the only other Maryland decisions involving parent-child immunity in which one of the members of the relevant family relationship was killed°in the occurrence giving rise to the claim.

*Smith* involved the death of a child whose parents were unmarried. The child, who lived with his mother, was killed in an accident while riding as a passenger in a car allegedly negligently operated by the father. This Court, over a dissent, affirmed a dismissal of the action based on parent-child immunity as it related to certain requirements of the wrongful death statute, currently codified as Maryland Code (1974, 1998 Repl.Vol.), §§ 3–902(a) and 3–901(e) of the Courts and Judicial Proceedings Article (CJ). CJ § 3–902(a) creates the cause of action by providing that "[a]n action may be maintained against a person whose wrongful act causes the death of another." "Wrongful act" is defined in CJ § 3–901(e) to mean "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued." We pointed out in *Smith*, by citing decisions of this Court rendered as early as 1880, that the "party injured" is the decedent. *Smith*, 319 Md. at 143 n. 4, 571 A.2d at 1221 n. 4. We further cited decisions rendered from 1877 to 1969 holding that the defenses of contributory negligence and assumption of the risk on the part of the decedent bar the survivor's wrongful death act claim. *Id.* at 144–45, 571 A.2d at 1222. Consequently, in addressing the parent-child immunity defense, we looked to the relationship between the decedent and the tortfeasor to determine whether the decedent could "maintain an action and recover damages if death had not ensued." CJ § 3–901(e).

The plaintiff-mother in *Smith,* looking at the parent-child relationship as if death had not ensued, argued that there was no relationship to protect because the child never lived with his father. We said, however, that "[r]ights and obligations, privileges and duties—the elements of parenthood—existed between the father and child despite that the child 'lived with his mother from the time of his birth until his death and never lived with his father.'" *Id.* at 147, 571 A.2d at 1223. Consequently, the father was immune from the suit.

*Smith* never directly addressed the effect on the immunity doctrine of the termination of the relationship of parent and child by the child's death in the accident because the decision turned on the requirement of the wrongful death statute that the viability of the claim of the injured party be tested as if death had not ensued. This made the relevant period of the relationship between father and son the period before the accidental death and not after it. In the instant matter the injured person is Miranda and the alleged tortfeasor is Susan. If death had not ensued Miranda could sue Susan. There is no inter-sibling immunity.

*Mahnke,* 197 Md. 61, 77 A.2d 923, was not a wrongful death case, although the facts were that the plaintiff's mother had been murdered by her father who, one week later, committed suicide. Both killings took place in the immediate presence of the plaintiff. It is sufficient for present purposes to note that this Court characterized the father's acts as "atrocious." *Id.* at 63, 77 A.2d at 923. The theory of the plaintiff's case was that "as a result of her father's acts and the conditions thereby created to which she was subjected, she has suffered shock, mental anguish and permanent nervous and physical injuries." *Id.* We held that parent-child immunity did not apply under the facts presented in *Mahnke.* We reasoned that "there can be no basis for the contention that the daughter's suit against her father's estate would be contrary to public policy, for the simple reason that there is no home at all in which discipline and tranquility are to be preserved." *Id.* at 68, 77 A.2d at 926. The facts of the case showed a "complete abandonment of the parental relation" and that "the rule giving him immunity

from suit by the child, on the ground that discipline should be maintained in the home, cannot logically be applied, for when he is guilty of such acts he forfeits his parental authority and privileges, including his immunity from suit." *Id.*

*Mahnke* formed the foundation for our recent decision in *Eagan*, 347 Md. 72, 698 A.2d 1097. *Eagan* involved a wrongful death action. The plaintiffs were the children of a mother who had been killed by her husband, the father of the children. The children argued that because their mother could have sued their father in negligence, free of any spousal immunity defense, their claim was not subject to parent-child immunity.[6] We said that the children's claim "is not derivative in the sense asserted," inasmuch as the children sought "to recover damages for [their] own loss accruing from the decedent's death." *Id.* at 82, 698 A.2d at 1102. Thus, the effect of *Eagan* when coupled with *Gross* is that, in addition to the need of the plaintiff to satisfy the condition of the wrongful death statute, *i.e.*, that the claim be one which the injured person could have brought had death not ensued, this Court will also look to the relationship between the beneficial plaintiff and the tortfeasor in a wrongful death action to determine whether there is parent-child immunity.

Under the circumstances in *Eagan*, where the killing amounted at least to the crime of voluntary manslaughter, we held as a matter of law that there was no immunity on the following rationale:

"When the death is occasioned by murder or voluntary manslaughter, however, any remaining relationships are far more likely to be sufficiently shattered to be beyond further impairment by a lawsuit. The blow is not just the death itself, or even the hard fact that it was caused by the other parent, but rather that the killing was intentional and not the product of mere carelessness. Added to the psychological trauma of that are the likely collateral consequences of such criminal behavior. The evidence in this case demon-

---

**6.** Neither the children nor the amicus curiae which sought total abrogation of parent-child immunity cited *Smith v. Gross*.

strates the point. When this suit was filed, there was no longer a family unit; Gladys was dead, John was in prison, and Laura and Kevin were in the legal and physical custody of another couple. John had no ability to exercise any parental discretion or control; because he was in prison, guardians had been appointed of the persons and the property of the children. The personal relationships between John and the children had soured to the point that there was little contact between them; John wrote to them from prison, but they did not respond. Certainly, there was no indication of any fraud or collusion between John and his children, and there was no evidence that resources that otherwise would have been devoted to the family unit would be depleted by the lawsuit. Indeed, John testified that his resources had been depleted in defending the criminal charge. In short, the underpinnings of the immunity doctrine no longer existed."

*Id.* at 83–84, 698 A.2d at 1103.

The facts of the case before us present an even greater lack of underpinnings for the application of the parent-child immunity doctrine than did the facts in *Eagan*. The prerequisite of the wrongful death statute is satisfied here because the injured person, Miranda, could sue her sister. Further, neither family harmony nor parental discipline can be affected in any way by the litigation because both children are dead. The wrongful death claim arose in the Parents as beneficial plaintiffs the moment the parent-child relationship with Susan, the alleged tortfeasor, terminated.

In holding that parent-child immunity barred the claim of the Parents, the Court of Special Appeals relied heavily on a passage from this Court's opinion in *Eagan*, saying:

"The *Eagan* court specifically declined to allow for an immunity exception to acts of negligence, such as automobile accidents, because:

" '[A]lthough such tragedies may well put a serious strain on some of the family relationships, they do not generally destroy a parent-child relationship. A parent who negli-

gently causes the death of his or her spouse or of a child can still maintain a parent-child relationship; *the family, even in its grief, can survive.'*

"347 Md. 72, 83, 698 A.2d 1097[, 1103] (1997) (emphasis added). We feel constrained to follow that reasoning...."

*Bushey,* 130 Md.App. at 181, 745 A.2d at 450. *Eagan* was a case in which the children and their father were living. It was their mother who had been intentionally killed. In that case the children were suing the father who would have had an immunity defense had his conduct been negligent, and not intentional. Here, the Parents are not suing a living child, and the above-quoted rationale from *Eagan* is inapplicable..

Another justification advanced as a basis for parent-child immunity is "the prevention of fraud and collusion." *Warren,* 336 Md. at 625, 650 A.2d at 255. That risk is completely absent in the instant matter. From the liability standpoint the Petitioners have no family members who can testify as to the happening of the accident. Proof of Susan's liability, if any, will depend upon physical facts and independent witnesses. From the standpoint of damages, the risk, if any, of fraud and collusion that is faced by Northern would not seem to be any greater in this case than in any case in which an insured sues an insurer on first-party coverage.

The third policy justification accepted as a basis for parent-child immunity is "the threat that litigation will deplete family resources." *Id.* at 625, 650 A.2d at 255. Where, as here, there is third-party and first-party insurance coverage the reference is to "the consequences of an award that exceeds available coverage." *Renko,* 346 Md. at 479, 697 A.2d at 476 (footnote omitted). This risk would seem almost certainly to be nonexistent in the instant matter. The overwhelming probability is that Susan, a seventeen year old high school student, died intestate. Thus any estate assets that would be applied to the claim of the Parents, as creditors, would be assets that would otherwise be paid by the estate to the Parents, as distributees, under Md.Code (1974, 1991 Repl.Vol.), § 3–104(b) of the Estates and Trusts Article.

For these reasons, we hold that parent-child immunity does not bar the Parents' claim against the Estate of Susan under the facts of this particular case.

### III

■ The final matter requiring our attention is a procedural error. Once again we are presented with an appeal in a declaratory judgment case in which the trial court failed to enter a written declaration of the rights of the parties. Nor did it file any written opinion which could be treated as a declaratory judgment. Instead, the docket entry and the separate document on which the judgment is set forth recite simply that summary judgment was entered in favor of Northern.

> "This Court has reiterated time after time that, when a declaratory judgment action is brought, and the controversy is appropriate for resolution by declaratory judgment, 'the trial court must render a declaratory judgment.' *Christ v. [Maryland ] Department [of Natural Resources ]*, 335 Md. 427, 435, 644 A.2d 34, 38 (1994) " '[W]here a party requests a declaratory judgment, it is error for a trial court to dispose of the case simply with oral rulings and a grant of ... judgment in favor of the prevailing party.' *Ashton v. Brown*, 339 Md. 70, 87, 660 A.2d 447, 455 (1995), and cases there cited."

*Harford Mut. Ins. Co. v. Woodfin Equities Corp.*, 344 Md. 399, 414–15, 687 A.2d 652, 659 (1997).

■ The error, however, is not jurisdictional. This Court may, in its discretion, review the merits of the controversy and remand for the entry of an appropriate declaratory judgment by the circuit court. *Compare Maryland Ass'n of Health Maintenance Organizations v. Health Servs. Cost Review Comm'n*, 356 Md. 581, 741 A.2d 483 (1999) (remanding for the entry of a declaratory judgment); *Ashton v. Brown*, 339 Md. 70, 660 A.2d 447 (1995) (same); *Robert T. Foley Co. v. Washington Suburban Sanitary Comm'n*, 283 Md. 140, 389 A.2d 350 (1978) (same) *with Harford Mut. Ins. Co. v. Woodfin*

*Equities Corp.,* 344 Md. 399, 687 A.2d 652 (remand without reaching merits of coverage issues).

Accordingly, on remand and after resolution of the issue addressed in Part I.C, *supra,* the circuit court should enter a written declaration of the rights of the parties.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY AND TO REMAND THIS ACTION TO THE CIRCUIT COURT FOR CHARLES COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT, NORTHERN ASSURANCE COMPANY OF AMERICA.

ELDRIDGE and RAKER, JJ., concur.

ELDRIDGE, J., concurring:

I agree that the judgments below should be reversed, and I concur in Parts I and III of the majority opinion. Furthermore, the majority correctly concludes in Part II of the opinion that the parents' claim is not barred by the doctrine of parent-child immunity. Nonetheless, I do not agree with the majority that there is a sound basis for distinguishing *Smith v. Gross,* 319 Md. 138, 571 A.2d 1219 (1990). The public policy rationale for not applying parent-child immunity in this case, which is the same public policy rationale underlying our refusal to apply parent-child immunity in *Eagan v. Calhoun,* 347 Md. 72, 698 A.2d 1097 (1997), cannot be reconciled with the decision in *Smith v. Gross.* The *Smith v. Gross* decision was not supported by any enactments of the General Assembly, was not supported by any prior decisions of this Court, and was not supported by public policy. Instead of attempting to distinguish *Smith v. Gross,* the case should be overruled.

As discussed by Judge Wilner for the Court in *Eagan v. Calhoun, supra,* 347 Md. at 74, 76, 698 A.2d at 1099, the

doctrine of parent-child immunity from suit in tort actions did not exist under English common law or Maryland common law prior to the twentieth century. The doctrine was invented by the Supreme Court of Mississippi in 1891, *Hewlett v. George,* 68 Miss. 703, 9 So. 885 (1891), and was initially adopted by this Court in 1930, *Schneider v. Schneider,* 160 Md. 18, 152 A. 498 (1930).[1] The doctrine has never been sanctioned by the General Assembly of Maryland.

The principal public policy in support of the judicially created parent-child immunity doctrine is "the protection of family integrity and harmony and of parental discretion in the discipline and care of the child. . . ." *Eagan v. Calhoun, supra,* 347 Md. at 75, 698 A.2d at 1099. *See, e.g., Renko v. McLean,* 346 Md. 464, 469, 697 A.2d 468, 470 (1997) ("the parent-child immunity doctrine . . . serv[es] the compelling public interest in preserving, under normal circumstances, the internal harmony and integrity of the family unit and parental authority in the parent-child relationship"); *Warren v. Warren,* 336 Md. 618, 626, 650 A.2d 252, 256 (1994) ("We are not willing to open the door to rebellious children and frustrated parents and allow the courts to become the arbitrator of parent-child disputes and the overseer of parental decisions"); *Frye v. Frye,* 305 Md. 542, 551, 505 A.2d 826, 831 (1986) (" 'the chief reason' for the rule [is] that 'such tort actions would disrupt and destroy the peace and harmony of the home which is against the policy of the law,' " quoting *Waltzinger v. Birsner,* 212 Md. 107, 126, 128 A.2d 617, 627 (1957)). We have also pointed out that the rule prevents "fraud and collusion" and prevents "litigation between parents and children [that] would deplete family resources." *Eagan v. Calhoun, supra,* 347 Md. at 75, 698 A.2d at 1099.[2]

---

**1.** Interestingly, the Supreme Court of Mississippi overruled *Hewlett v. George* 101 years after that case was decided. *See Glaskox v. Glaskox,* 614 So.2d 906 (Miss.1992).

**2.** The persuasiveness of these additional reasons is questionable. Thus, we have abolished the doctrine of interspousal immunity in tort actions

Under circumstances where the public policy reasons underlying parent-child immunity in tort actions have no application, *i.e.,* under circumstances where, at the time of the tort action, there is no parent-minor child relationship which will be disrupted by the tort suit, this Court has generally held that the suit is not barred by the doctrine of parent-child immunity. *See Eagan v. Calhoun, supra,* 347 Md. at 76–77, 698 A.2d at 1099–1100 (In prior cases, "we essentially adopted the view . . . that, although the doctrine was useful within the bounds of a normal parent-child relationship, it had no rational justification where the foundation did not exist"); *Warren v. Warren, supra,* 336 Md. 618, 650 A.2d 252 (majority opinion), 336 Md. 631, 650 A.2d 258 (Raker, J., concurring) (Parent-child immunity doctrine does not bar a child's negligence action against his stepparent; as emphasized in the concurring opinion, the stepparent did not stand *in loco parentis* to the child); *Hatzinicolas v. Protopapas,* 314 Md. 340, 357, 550 A.2d 947, 956 (1988) (Parent-child immunity is inapplicable to a tort suit brought by a minor child against her father's business partner, even though the father and business partner may have been joint tortfeasors and the partner might be able to obtain contribution from the father, with the Court stating: "Preservation of the family interests . . . does not require that we extend parent-child immunity to bar any recovery from a parent's partner"); *Waltzinger v. Birsner, supra,* 212 Md. 107, 128 A.2d 617 (An emancipated child may sue his or her parent in tort); *Mahnke v. Moore,* 197 Md. 61, 68, 77 A.2d 923, 926 (1951) ("there can be no basis for the contention that the daughter's suit against her father's estate would be contrary to public policy, for the simple reason that there is no home at all in which discipline and tranquility are to be preserved").

based on negligence. *See Doe v. Doe,* 358 Md. 113, 120, 747 A.2d 617, 620 (2000); *Boblitz v. Boblitz,* 296 Md. 242, 462 A.2d 506 (1983). Negligence actions between spouses present the same danger of fraud and collusion as negligence actions between parent and child.

With regard to depleting family resources, many allowable non-tort actions involving parents and children present a much greater danger that family resources will be depleted. In the case of negligence actions between parent and child, there will normally be liability insurance.

The above-cited cases clearly reflect the principle that the court created doctrine of parent-child immunity is inapplicable where a parent-minor child relationship does not exist and where, consequently, the public policy underlying the doctrine would not be served. The only case in this Court representing an exception to this principle is *Smith v. Gross, supra,* 319 Md. 138, 571 A.2d 1219. *Smith v. Gross* is wholly out-of-step with our other cases dealing with parent-child immunity from tort suits.

*Smith v. Gross,* like *Eagan v. Calhoun, supra,* 347 Md. 72, 698 A.2d 1097, and the present case, was a wrongful death action. Also, as in the case at bar, there was a count under the survival statute. Moreover, the actions in both this case and the *Smith* case were based on the death of a minor child in an automobile accident, allegedly caused by the negligent driving of another family member. In *Smith,* the parents were not married, did not live together as a family unit, and the child lived with his mother. The child had never lived with his father. A few days after the child's second birthday, the father was driving an automobile with the child as a passenger, and the child died in an accident allegedly caused by the father's negligent driving. The child's mother, who was the personal representative of the child's estate, brought wrongful death and survival actions against the father. The trial court granted a motion to dismiss based on parent-child immunity, and this Court, in a 5–2 decision, affirmed on that ground.

The plaintiff-appellant's principal argument in *Smith* was that "the parent-child immunity doctrine is inapplicable to the case at bar because there is no parent-child relationship to protect ."[3] The plaintiff-appellant contended: "The key to the immunity doctrine is the protection of the parent-child relationship. Upon the death of the infant, this relationship is extinguished. There simply is no relationship to protect and no policy reason to invoke the doctrine."[4] Reliance was placed on

**3.** *Briefs September Term 1989,* No. 79, appellant's brief at 3.

**4.** *Id.* at 6–7.

*Waltzinger v. Birsner, supra,* 212 Md. 107, 128 A.2d 617, and *Mahnke v. Moore, supra,* 197 Md. 61, 77 A.2d 923.

This Court rejected the plaintiff-appellant's policy argument in *Smith* because, according to the Court, there was a parent-child relationship prior to the tortious conduct and the death. *Smith,* 319 Md. at 148, 571 A.2d at 1223. The Court pointed out that, under the wrongful death statute, "wrongful act" is defined as "an act, neglect, or default . . . which would have entitled the party injured to maintain an action and recover damages if death had not ensued." Maryland Code (1974, 1998 Repl.Vol.), § 3–901(e) of the Courts and Judicial Proceedings Article. The Court also pointed out that the survival statute refers to "a personal action which the decedent might have commenced or prosecuted. . . ." Code (1974, 1991 Repl.Vol., 2000 Supp.), § 7–401(y) of the Estates and Trusts Article. Relying on these statutory provisions, the *Smith* majority leaped to the conclusion that a "prerequisite" for bringing a wrongful death or survival action was the ability of the decedent to have brought an action if there had been no death. 319 Md. at 149, 571 A.2d at 1224. Since, in the view of the *Smith* majority, parent-child immunity would have precluded a tort action by the child against the father if there had been no death, the same judicially created immunity precluded wrongful death and survival actions.

The majority today reiterates the holding and "reasoning" of *Smith.* The majority states that there is a *"requirement* of the wrongful death statute that the viability of the claim of the injured party be tested as if death had not ensued." (Opinion at 647, emphasis added). Referring to *Smith,* the majority continues *(ibid.):* "This made the relevant period of the relationship between father and son the period before the accidental death and not after it." The majority then attempts to distinguish the present case from *Smith* on the ground that, "[i]f death had not ensued[,] Miranda could sue Susan. There is no inter-sibling immunity." *(Ibid.).*

Preliminarily, there are problems with the majority's distinction of *Smith* and the majority's view that the relevant

period of the parent-child relationship is the period before death. Miranda was a minor and could not have, herself, brought a tort action against Susan. If the sisters had not died, the action against Susan, on behalf of Miranda, would have been brought by Miranda's parents who also are Susan's parents. *See* Maryland Rule 2–202(b). Language in this Court's opinion in *Schneider v. Schneider, supra,* 160 Md. at 22–23, 152 A. at 499–500, the case adopting the doctrine of parent-child immunity, suggests that the parents, on behalf of Miranda, could not have sued their other minor child, Susan.

Furthermore, if the relevant period of the parent-child relationship is the period before the tortious death, then, arguably, both *Eagan v. Calhoun, supra,* 347 Md. 72, 698 A.2d 1097, and *Mahnke v. Moore, supra,* 197 Md. 61, 77 A.2d 923, are inconsistent with the instant opinion and with *Smith v. Gross.* In addition, this Court emphasized in *Eagan,* 347 Md. at 82, 698 A.2d at 1102, that a wrongful death action "is not derivative in the sense" that the defenses, or non-defenses, in a wrongful death action are the same as those in a tort action if the decedent had lived. The Court in *Eagan* continued (*ibid.*):

> "It follows from the fact that the action is a personal one to the claimant that the claimant is ordinarily subject to any defense that is applicable to him or her, whether or not it would have been applicable to the decedent. Thus, the fact that [the deceased mother] would not have been barred by any doctrine of parent-child immunity from suing [the tortfeasor father] does not relieve [the children] of that impediment."

The converse should also apply. The fact that a plaintiff in a tort suit may have been barred by parent-child immunity from suing the defendant does not mean that different plaintiffs in a wrongful death action, where there is no parent-child relationship, should be barred from suing.

More importantly, however, the reasoning of the majority in *Smith v. Gross* and the majority today is fundamentally flawed. The critical language from the wrongful death act

relied upon by the majority, *i.e.* the reference to an act which would have been the basis for a suit if there had been no death, is not a "prerequisite" or a "requirement" for bringing a wrongful death action. The language is simply part of the definition of "wrongful act," and is a shorthand way of describing the tortious conduct that will permit suit. At common law, there was no cognizable tort if death occurred. The references to an act which would have permitted a tort suit if there had not been death was employed in the wrongful death and survival statutes in lieu of listing basic elements of various torts and basic, established defenses.

The language in the wrongful death and survival statutes, referring to an action if death had not ensued, was in the original wrongful death act enacted by the General Assembly in 1852 and was in the original survival statute enacted by the General Assembly in 1798. *See* Ch. 299, § 1, of the Acts of 1852; Ch. 101, Subch. 8, § 5, of the Acts of 1798. There was no such thing as a parent-child immunity doctrine in 1798 or 1852. As previously discussed, this Court adopted the doctrine in 1930; the General Assembly has never embraced the doctrine. Obviously, when the General Assembly enacted the survival and wrongful death statutes in 1798 and 1852, it did not contemplate parent-child immunity which was judicially created in 1930. The General Assembly very likely envisioned basic tort defenses then existing such as contributory negligence or assumption of the risk. The Legislature also may have contemplated basic general defenses to various torts which might in the future be adopted pursuant to the authority to change the common law. It is quite doubtful, however, that the Legislature intended that a judicially created defense, designed for certain circumstances because of public policy, would be applied to the entirely different circumstances addressed by the wrongful death and survival statutes, where the public policy would not be served.

The parent-child immunity doctrine was created solely for the situation involving a tort action between a live parent and a live minor child. A tort suit, otherwise authorized by the law, might disrupt the parent-child relationship in this situation.

When there is no action between a live parent and a live child, and no parent-minor child relationship to be disrupted by the suit, the immunity doctrine is obviously inapplicable. It was not created by this Court to be applied under such circumstances, as shown by the decisions in *Waltzinger v. Birsner, supra,* 212 Md. 107, 128 A.2d 617, and *Mahnke v. Moore, supra,* 197 Md. 61, 77 A.2d 923. The *Smith v. Gross* opinion, however, misused statutory language, enacted long before the adoption of the parent-child immunity doctrine, to apply that doctrine to a situation where there was no parent-child relationship.

To reiterate, the parent-child immunity doctrine has no statutory basis; it was judicially created solely for the situation where there is an ongoing parent-minor child relationship which an intervivos tort action might disrupt. Where there exists no ongoing parent-minor child relationship to be disrupted, there is utterly no reason to apply the doctrine. *Smith v. Gross* should be overruled.

Judge Raker has authorized me to state that she joins this concurring opinion.